# AMENDED OPINION[*]

*This opinion is subject to revision before final publication in the Pacific Reporter*

## 2020 UT 47

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ROCKY FORD IRRIGATION COMPANY,
*Appellant*,

*v.*

KENTS LAKE RESERVOIR COMPANY and DOES 1 THROUGH 200,
*Appellees*,

and

BEAVER CITY,
*Intervenor and Appellee*.

No. 20170290
Heard December 10, 2018
Reheard March 11, 2020
Filed July 13, 2020

On Direct Appeal

Fifth District, Beaver County
The Honorable Paul D. Lyman
No. 100500156

Attorneys:[1]

Stephen E.W. Hale, Matthew E. Jensen, J. Mason Kjar,
Salt Lake City, for appellant

_____

[*] After this opinion originally issued (2019 UT 31, --- P.3d ---), the parties and State Engineer filed petitions for rehearing, seeking substantive changes to Parts II(A) and (B) of the original opinion. We granted the petitions and reheard the case. This opinion replaces our initial decision.

[1] Attorneys for amicus curiae Utah State Engineer: Sean D. Reyes, Att'y Gen., Norman K. Johnson, Julie L. Valdes, Assist. Solic. Gen., Salt Lake City.

John H. Mabey, Jr., David C. Wright, Salt Lake City,
for appellees Kents Lake Reservoir Company and
Does 1 through 200

Justin W. Wayment, Christian Jones, Cedar City,
for intervenor-appellee

───────────

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

───────────

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1   This case comes to us on direct appeal from the Fifth District Court. Kents Lake Reservoir Company[2] and Rocky Ford Irrigation Company both acquired water rights in the Beaver River in the late nineteenth century. But as both water rights and irrigation techniques evolved, the administration of the Beaver River grew increasingly complex. Eventually Rocky Ford sued Kents Lake seeking clarification regarding the priority of the parties' rights and Kents Lake's obligations as to river administration and measurement. Rocky Ford lost on each of its claims below and appealed. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

¶2   Around 1870, settlers began diverting water from the Beaver River and conveying it through canals and ditches to their crops. These initial rights were direct flow rights—the right to take water from the source and apply it directly to the end use without reservoir storage. After most of the base flow of the Beaver River was allocated via direct flow rights, water users constructed reservoirs to store spring runoff and winter flows to allow for later use on their crops.

───────────────────────────

[2] There is some inconsistency in the spelling of this party's name in the briefing and the record. The briefs on appeal use the "Kents Lake" formulation. But in the lower court, the party is often referred to as "Kent's Lake." We stick with the former formulation except when quoting from the district court record.

A. The Parties' Initial Direct Flow and Storage Rights in the
Beaver River System

¶3    Kents Lake (along with its shareholders) and Rocky Ford
each acquired various direct flow rights and corresponding priority
dates throughout the late nineteenth and early twentieth centuries.
They also obtained storage rights in reservoirs they built. Today,
Kents Lake retains an 1890 storage right to divert water into the
Upper Kents Lake and Middle Kents Lake Reservoirs (collectively,
the "South Fork Reservoirs"), which it constructed in the
headwaters of the Beaver River System. And Rocky Ford retains a
1907 storage right to divert water into the Minersville Reservoir,
which it constructed at the bottom of the Beaver River System.

¶4    In the early 1900s, the Fifth District Court conducted a
general adjudication of the Beaver River that culminated in the 1931
Beaver River Decree (Decree). The Decree established and
confirmed priority dates and use limitations on Beaver River water
rights, including direct flow rights acquired by Rocky Ford in 1870,
storage rights in Minersville Reservoir acquired by Rocky Ford in
1907, storage rights in the South Fork Reservoirs acquired by Kents
Lake in 1890, and direct flow rights for certain Kents Lake
shareholders.[3] The Decree also divided the Beaver River into an
upper and lower portion, with the Patterson Dam serving as the
dividing line. Water users located above the dam were
denominated "upper users" and allowed to divert water before
"lower users"—despite later priority dates.[4]

¶5    Finally, the Decree required users to "promptly install and
perpetually maintain suitable . . . measuring devices at or [as] near
as possible to their respective points of diversion or at such other
points as may be designated in their decree, for the measurement
of all water diverted hereunder for consumptive uses." Under the
Decree, water users were "permanently enjoined from diverting . . .

_____

[3] We refer to Kents Lake and Kents Lake's shareholders
collectively as "Kents Lake."

[4] This divide was approved because lower users usually
benefitted from return flows. Return flows refer to water that is not
consumed by plants or evaporation and ultimately flows back,
either above or below ground, into the source. Flood irrigation, the
primary method of water use employed at the time of the Decree,
consumed only 40 percent of the diverted water, leaving 60 percent
to evaporate or reenter the Beaver River as return flows.

any water for such consumptive purposes through any ditch, canal, conduit or other device not provided with proper headgates, control works, and measuring devices."

### B. Kents Lake's New Reservoir and Change Applications

¶6 A few years after the Decree was entered, Kents Lake sought to build an additional reservoir—Three Creeks Reservoir. In order to obtain rights to store water in this new reservoir, Kents Lake filed two applications with the State Engineer. One application sought to reallocate some of Kents Lake's current storage in the South Fork Reservoirs to Three Creeks Reservoir (a change to its existing storage right). The other sought to store additional water in Three Creeks Reservoir (a new storage right). The State Engineer reviewed the applications and put the other Beaver River System water users on notice of Kents Lake's proposed changes. Rocky Ford protested both applications, but the State Engineer ultimately approved them because he found that each would put the water toward a beneficial use and not impair existing rights.[5]

¶7 In 1953 Rocky Ford and Kents Lake entered into an agreement (Agreement) that provided, among other things, that (1) Rocky Ford would not protest Kents Lake's planned change application regarding Three Creeks Reservoir—an application seeking to add an optional storage right in the reservoir to some of Kents Lake's preexisting direct flow rights; (2) Kents Lake would not oppose Rocky Ford's planned enlargement of its reservoir; and (3) Rocky Ford has an exclusive right to store all water available to it from November 1 to April 1 each year.

¶8 As agreed, Kents Lake then submitted the new change application. And as promised, Rocky Ford did not protest. The State Engineer approved the application and granted Kents Lake's request for these "direct storage changes." Kents Lake now had a direct storage right (in addition to its direct flow right)—allowing it to either use the water directly (as it was previously entitled to do) *or* store it in Three Creeks Reservoir. And Kents Lake

---

[5] Rocky Ford challenged the State Engineer's approval, eventually appealing the case to this court. We upheld the approved changes and concluded that Kents Lake could divert water into Three Creeks Reservoir if it would have been available for storage in South Fork Reservoirs. *Rocky Ford Irr. Co. v. Kents Lake Reservoir Co.* (*Rocky Ford I*), 135 P.2d 108, 114 (Utah 1943).

eventually perfected its changed use pursuant to Utah Code sections 73-3-12 and -17, receiving certification from the State Engineer of its right to the changed use "subject to prior rights." UTAH CODE § 73-3-17 (1953).

### C. Irrigation Changes and Rocky Ford's Lawsuit

¶9    Beginning in the 1970s, Beaver River water users began to gradually convert from flood irrigation to sprinkler systems—more efficient watering mechanisms that require less water and produce less return flows.[6] Some upper river users stored these efficiency gains, reducing the amount of water flowing downstream. This reduction in flow can adversely affect lower users (like Rocky Ford) if there is insufficient water to fulfill their rights.

¶10 This is what allegedly happened here. As a result, in 2003 Rocky Ford asked the State Engineer to enhance oversight of Beaver River water storage. Over the next year and a half, Rocky Ford, Kents Lake, and the State Engineer corresponded about improved storage regulation. And the State Engineer found that Kents Lake's measurement devices were deficient.

¶11 Unsatisfied, Rocky Ford filed suit in November 2010, seeking damages, declaratory relief, injunctive relief, and rescission of the 1953 Agreement. In support of its claims, Rocky Ford pointed to Kents Lake's alleged water right interference, conversion of water rights, and negligence. Rocky Ford asserted that its water rights had been injured by Kents Lake's direct storage changes and failure to measure water usage in accordance with the 1931 Decree. Kents Lake filed a counterclaim seeking clarification of the parties' water rights under the Agreement. Three years later, Beaver City intervened.

¶12 Following discovery, Rocky Ford moved for partial summary judgment, asserting that (1) Kents Lake's direct storage changes maintain their original 1890 priority date (from the underlying right) only to the extent they do not injure Rocky Ford's direct flow rights, and (2) Rocky Ford's direct flow rights are not subordinated or waived under the plain language of the Agreement. The district court denied the motion. In so doing, the

---

[6] In contrast to flood irrigation, which consumes only 40 percent of the diverted water and leaves the remainder for return flows, sprinkler irrigation consumes about 75 percent of the diverted water and leaves only 25 percent for return flows.

court concluded that Rocky Ford had "intentionally waived its direct flow rights against [Kents Lake] through its entrance into the 1953 agreement" and that Kents Lake could continue to store its water "even to the detriment of [Rocky Ford]'s direct flow rights."

¶13 The parties then stipulated to dismissal of all damages claims (including the water right interference claim), leaving only claims for declaratory relief, injunctive relief, and rescission of contract. At trial, the court's denial of Rocky Ford's motion for summary judgment precluded any evidence about the priority of the direct storage changes or the meaning of the Agreement. The court instead focused on Kents Lake's measurement obligations and the continued efficacy of the Agreement. During the three-day bench trial, the court refused to admit evidence from Rocky Ford's expert about the impact of sprinklers on the Beaver River's return flows.

¶14 In June 2016, the district court denied Rocky Ford's request for injunctive and declaratory relief. It denied any request for relief for Kents Lake's alleged interference with Rocky Ford's direct flow rights on the ground that Rocky Ford had failed to carry its burden of proving injury to its rights caused by the direct storage changes. And it further denied the request for relief regarding Kents Lake's measurement obligations on the ground that Kents Lake had followed the State Engineer's instructions. The court also declined to rescind the 1953 Agreement, concluding that Rocky Ford had not proved material breach, impracticability, frustration of purpose, or mutual mistake. Lastly, the court *sua sponte* awarded attorney fees to Kents Lake and Beaver City under Utah Code section 78B-5-825.

¶15 The district court later denied Rocky Ford's rule 59 motion seeking reversal of the fee award. Rocky Ford appealed the court's decision denying the motion for partial summary judgment, its entry of final judgment, and its award of attorney fees. This court heard argument on the appeal and published an opinion in July 2019. *Rocky Ford Irr. Co. v. Kents Lake Reservoir Co.*, 2019 UT 31, --- P.3d ---. The parties and State Engineer thereafter filed petitions for rehearing, seeking substantive changes to Parts II(A) and (B) of the original opinion. We granted the petitions and reheard the case in March 2020. This opinion replaces our prior opinion.

## II. DISPOSITION

¶16 Five principal questions are presented for review. (A) Did the district court err in denying Rocky Ford's motion for summary judgment? (B) Did it err in refusing to declare that Kents Lake could

not store its efficiency gains? (C) Did it err in refusing to declare that Kents Lake must measure its usage consistent with the requirements of the Beaver River Decree? (D) Did it err in refusing to rescind the 1953 Agreement? (E) Did it err in awarding attorney fees to Kents Lake and Beaver City?

¶17 We reverse in part, affirm in part, and remand. We reverse the court's denial of Rocky Ford's motion for summary judgment, the denial of Rocky Ford's request for declaratory judgment as to Kents Lake's measurement obligations under the Decree, and the decision awarding attorney fees to Kents Lake and Beaver City. But we affirm the court's decision refusing to declare that Kents Lake could not store its efficiency gains and the decision refusing to rescind the 1953 Agreement. And we remand for further proceedings on points identified below.

### A. The District Court Erred in Denying Rocky Ford's Motion for Summary Judgment

¶18 We first consider whether the district court erred in denying Rocky Ford's motion for partial summary judgment. Rocky Ford's motion sought judgment as a matter of law on two points: (1) that Rocky Ford's direct flow rights are not subordinated or waived under the terms of the 1953 Agreement, and (2) that Kents Lake's direct storage changes maintain their original 1890 priority date (from the underlying right) only to the extent they don't harm Rocky Ford's direct flow rights. The district court denied the motion, declining to enter declaratory judgment on either point. It based its ruling solely on the terms of the Agreement, concluding that Rocky Ford had unambiguously subordinated its direct flow rights to Kents Lake's rights through the Agreement, and that Kents Lake's direct storage changes accordingly could harm Rocky Ford's direct flow rights without losing their original senior priority.

¶19 We hold that Rocky Ford was entitled to declaratory judgment on the second point noted above, but not on the first. First, we hold that the Agreement does not unambiguously subordinate Rocky Ford's direct flow rights, and thus that summary judgment on this theory was inappropriate.[7] Second, we

---

[7] In so doing we reject only the district court's determination that the Agreement *unambiguously* subordinates Rocky Ford's direct flow rights. We do not affirmatively declare that the

(continued . . .)

hold that Kents Lake's direct storage changes retain their original priority only to the extent they do not injure Rocky Ford's direct flow rights. Third, we hold that despite this conclusion, Rocky Ford has not preserved any viable claim for such injury on the record before us on appeal.

¶20 In other words, our judgment is technically a reversal of the district court—we hold that Rocky Ford was entitled to judgment as a matter of law on the second point on which it sought a declaration of its rights. But the practical effect of our decision is ultimately in line with the district court's disposition: Kents Lake's direct storage changes retain their original priority over Rocky Ford's direct flow rights. That effect follows, however, not from the terms of the 1953 Agreement, but from the fact that Rocky Ford has thus far brought no viable claim of injury.

### 1. The 1953 Agreement Does Not Unambiguously Subordinate Rocky Ford's Direct Flow Rights

¶21 In its motion for summary judgment, Rocky Ford first asked the district court to declare that its direct flow rights are not subordinated or waived under the terms of the 1953 Agreement. The district court denied that request. In fact, it reached the contrary conclusion, holding that the 1953 Agreement was clear and unambiguous in establishing that Rocky Ford intentionally subordinated its direct flow rights to Kents Lake's rights.

¶22 The district court's ruling focused on the recital paragraphs of the Agreement. The first two recital paragraphs state that both Rocky Ford and Kents Lake have "various rights in the Beaver River."[8] The fourth recital paragraph identifies the priority dates of some of these rights.[9] And the fifth recital paragraph describes the

---

Agreement does not *in fact* subordinate Rocky Ford's direct flow rights. *See infra* ¶ 25.

[8] The relevant text of these clauses is as follows: "WHEREAS, Rocky Ford has *various rights* to the use of water of the Beaver River and its tributaries, including Application No. 1215, Certificate No. 2388, issued by the State Engineer of the State of Utah; and WHEREAS Kent's Lake has various rights to the use of waters of the Beaver River and its tributaries . . . ." (Emphasis added.)

[9] The full text of this clause is as follows: "WHEREAS, the priority date of the water right of Kent's Lake for its said 1660 acre

(continued . . .)

purpose of the Agreement: "to provide for the practical administration of storage under the water rights mentioned *above* and to prevent future controversy concerning the diversion of storage under said water rights . . . ." (Emphasis added.) The Agreement then sets forth its terms in greater detail.

¶23 The district court believed that the conflict between Rocky Ford and Kents Lake hinged on which of Rocky Ford's water rights were implicated by the fifth recital clause's reference to the "above" rights. The court held that the "above" rights referred to in the fifth recital implicated not only the rights detailed in paragraph four, but also Rocky Ford's various rights referred to in paragraph one. It was "baffle[d] . . . to learn that [Rocky Ford] want[ed it] to read 'various rights' to mean 'various rights except Rocky Ford's direct flow rights.'" To interpret the contract to waive only part of Rocky Ford's rights, the court reasoned, "would nullify the 1953 agreement." The court thus concluded that Rocky Ford had unambiguously waived its direct flow rights and given Kents Lake's changed use outright senior priority.

¶24 Kents Lake does not defend this analysis on appeal. It effectively concedes that there is at least a reasonable dispute about whether the reference to "above rights" in the fifth recital refers only to those rights specifically detailed in paragraph four, or also to Rocky Ford's "various rights" referenced in paragraph one. With this in mind, we reverse the district court's decision on summary judgment to the extent it was based on the determination that the Agreement unambiguously established that Rocky Ford's direct flow rights are subordinated to Kents Lake's rights.

¶25 But we also decline to render a judgment endorsing Rocky Ford's interpretation of the Agreement. On this record and in this posture, we cannot conclude that the Agreement unambiguously supports Rocky Ford's position either. Instead we base our summary judgment decision on other grounds (*see infra* Part

---

feet is 1890, and the priority date of Rocky Ford under its Certificate No. 2388 for 25,477.5 acre feet is February 25, 1907, and the priority date of Kent's Lake Application No. 13420 for 1193 acre feet is March 8, 1940, and the priority date of the direct flow rights of the various stockholders of Kent's Lake referred to herein have priority dates of 1890 and earlier . . . ."

II(A)(2)), and leave the parties to decide whether to seek to litigate the interpretation of the Agreement on remand.[10]

### 2. Kents Lake's Changes Retain Original Priority Only to the Extent They Do Not Injure Rocky Ford's Rights

¶26 Rocky Ford also sought a declaration that Kents Lake's direct storage changes retain their original priority only to the extent they don't harm Rocky Ford's direct flow rights. The district court denied that request on the basis of its interpretation of the Agreement. Because it concluded that Rocky Ford's rights were clearly and unambiguously subordinated under the terms of the Agreement, the district court held that Kents Lake's direct storage changes could harm Rocky Ford's direct flow rights with no effect on Kents Lake's priority.[11]

¶27 We reverse. The district court's conclusion fails to the extent it relies on the above-noted interpretation of the Agreement. It is also contrary to law. Kents Lake's direct storage changes presumptively retain the original priority date of the underlying water right to the extent they do not injure other water rights that were vested at the time of the change.

¶28 This is made clear in the Utah Code. The code provides that a water user may seek to change its rights in a water source by filing a change application with the State Engineer. UTAH CODE § 73-3-3 (1953). A change application requests a change in the "place of diversion or use" of the water for a purpose other than that "originally appropriated." *Id.* Because such a changed use is not permitted "if it impairs any vested right,"[12] *id.*, other water users are entitled to file a protest of a proposed change with the State

---

[10] It is not apparent that the interpretation of the Agreement will merit attention on remand given our conclusions below that (a) Rocky Ford's direct flow rights remain junior to Kents Lake's direct storage rights absent proof of injury, and (b) Rocky Ford has asserted no viable claim for injury. But we leave the question whether further proceedings on the Agreement are appropriate for the parties and the district court on remand.

[11] This conclusion was also reiterated in the final judgment. *See infra* Part II(B).

[12] The statute does suggest that a change could impair a vested right if there were "just compensation," UTAH CODE § 73-3-3 (1953), but that is not at issue in this case.

Engineer, *id.* § 73-3-7 (1953). The State Engineer reviews impairment claims and approves a change application if there is "reason to believe" that the approval will not impair vested water rights. *Searle v. Milburn Irr. Co.*, 2006 UT 16, ¶ 31, 133 P.3d 382; *see also* UTAH CODE § 73-3-3 (1953).

¶29 When the State Engineer does approve a change application, it approves those changes "subject to" existing vested water rights. UTAH CODE § 73-3-17 (1953). In *Rocky Ford Irrigation Co.* (*Rocky Ford I*), this court explained that our affirmance of an approved change was "limited to a determination of whether there is probable reason to believe that . . . approval of the application will injure the vested rights of the protestants," and that Rocky Ford "could seek proper redress by a suit for damages or . . . injunctive relief if Kents Lake['s changes did in fact] unlawfully interfere[] with [its] rights." 135 P.2d 108, 113–14 (Utah 1943). Similarly, in affirming changes in *American Fork Irrigation Co. v. Linke*, we explained that "[i]f, in executing the plan [to convert direct flow rights to storage rights], the plaintiffs *interfere with or diminish the rights of others*, a remedy is available, particularly since the trial court approved the application *subject to the rights of others and without prejudice thereto*, and since approval of plaintiffs' application . . . simply allows them to proceed with a plan *specifically conditioned by the trial court on respecting the rights of others*." 239 P.2d 188, 192 (Utah 1951) (emphases added) (footnotes omitted). And in *Whitmore v. Murray City*, we held that "Murray City, by obtaining permission from the state engineer to change its point of diversion, only obtained a right to do so *if no prior vested rights were affected*. The recording of its certificate gave it no greater right." 154 P.2d 748, 751 (Utah 1944) (emphasis added).

¶30 Because a change to a water right is made *subject to* preexisting water rights, it is clear that the change cannot harm those preexisting water rights. A subsidiary point is also implicit: The change maintains its original priority only so long as it does not harm preexisting rights. We highlighted this principle in *Hague v. Nephi Irrigation Co.*, where we explained that "[w]hen water has been lawfully appropriated, the priority thereby acquired *is not lost by changing the use* for which it was first appropriated and applied, or the place at which it was first employed, *provided that the alterations made . . . shall not be injurious to the rights acquired by others prior to the change*." 52 P. 765, 769 (Utah 1898) (emphases added) (citation omitted).

¶31 There is a presumption that a changed water right retains its original priority date unless and until an injury to preexisting vested water rights is established.[13] This presumption dates back to early statehood, and we reaffirm it today. In this case, it means that Kents Lake's changed right retains priority over Rocky Ford's rights so long as Kents Lake's changed water storage does not injure Rocky Ford's direct flow rights.

¶32 Kents Lake's only real opposition to this conclusion is its assertion that Rocky Ford has no viable claim alleging that Kents Lake's direct storage changes resulted in injury to Rocky Ford's direct flow rights. We ultimately agree with Kents Lake on this point, concluding (in Parts II(A)(3) and II(B)) that Rocky Ford's claims of injury from Kents Lake's direct storage changes are either waived or not supported by this record. That conclusion, however, goes only to the *application* of the declaration of law that Rocky Ford asked for on summary judgment—a declaration that Kents Lake's changed right retains priority over Rocky Ford only to the extent it does not injure Rocky Ford. Rocky Ford's proposed declaration[14]

---

[13] The question whether there is an injury to vested water rights is highly fact-specific, and is determined on a case-by-case basis in actions between appropriators. *See, e.g.*, *Rocky Ford I* at 114; *see also Wayment v. Howard*, 2006 UT 56, ¶ 9, 144 P.3d 1147.

[14] The precise nature of the declaration sought by Rocky Ford is a bit unclear on this record. In its motion for summary judgment, Rocky Ford explained that its motion "d[id] not seek to establish" interference, but only to "establish that [] Kents Lake's storage under the direct storage changes is prohibited, as a matter of law, from [interfering with] Rocky Ford's direct flow rights." While Rocky Ford did assert that "Kents Lake's storage does, in fact, [interfere with] Rocky Ford's water rights," it acknowledged that "proof of that [interference] involves disputes of fact such that trial will be necessary on that issue." So Rocky Ford's motion seemed to explicitly request only a clarification of the governing law.

Yet at least one part of the motion also seemed to advert to a request for an application of such law in its favor—a specific "declaration from the court establishing the priority of Rocky Ford's direct flow rights" in relation to Kents Lake's direct storage changes. But this difference is immaterial to our disposition. To the extent Rocky Ford was seeking the latter sort of declaration, such

(continued . . .)

was correct. And the district court erred in refusing to enter summary judgment on this narrow point.

### 3. Rocky Ford Has No Viable Claim for Injury on This Record

¶33 Our determination that Kents Lake's direct storage changes maintain their original priority date only to the extent they do not injure Rocky Ford's direct flow rights might seem to necessitate a remand on this point—for a determination whether Kents Lake's direct storage changes have in fact injured Rocky Ford's direct flow rights, opening the door to potentially rebutting the presumption of original priority.[15] Yet Kents Lake asserts that Rocky Ford is barred from advancing any such claims under doctrines of "waiver, release, ratification, or . . . estoppel." Rocky Ford disagrees, asserting that while it may have waived some such claims, it has not waived *all* of them. We agree with Kents Lake. We hold that any claims for injury that might rebut the presumption that Kents Lake's direct storage changes retain their original priority have either been waived or have not been proven on this record. And we therefore see no need for such claims to be litigated on remand—unless the district court identifies a basis for admitting new evidence in the proceedings on remand.[16]

---

request overlaps completely with the relief it sought at trial on its interference claim. And that claim fails on this record for reasons explained below. *See infra* Parts II(A)(3) and II(B).

[15] In so stating we are not holding that proof of interference would necessarily *require* a change in priority—just that it could potentially do so. *See infra* ¶ 57 n.27.

[16] We acknowledge that the court's denial of Rocky Ford's motion for summary judgment precluded most evidence concerning the priority of the direct storage changes, including evidence from Rocky Ford's expert about the impact of sprinklers on the historical return flows to the Beaver River.

That said, we do not foreclose the possibility that Rocky Ford could identify a basis for introducing the excluded evidence either on remand or in a future proceeding in which it asserts an interference claim. Our conclusion that Rocky Ford has no viable claim for injury is based on the record before us. That record may change if, in light of our reversal of its denial of summary judgment, the district court identifies a basis for admitting more evidence on remand than it did in the original trial. Our decision

(continued . . .)

Opinion of the Court

¶34 Because the parties' briefing on this question revealed some confusion in our law governing claims of injury that may rebut the presumption of original priority, we take this opportunity to clarify that law. In the paragraphs below, we first clarify how the presumption of original priority can be rebutted under our law and then explain why Rocky Ford has thus far failed to do so. Because Rocky Ford has made no viable claim of injury that could rebut the presumption that Kents Lake's direct storage changes retain their original priority, we conclude that there is no basis for such claim on the current record.

### a. Rebutting the presumption of original priority: impairment versus interference

¶35 An aggrieved party may allege an injury sufficient to defeat the presumption of original priority by either protesting a change during the application process or bringing a claim after the change has been approved. A party can, in other words, allege either *prospective* injury stemming from another water user's *proposed* change, or *actual* injury stemming from another water user's *actual* change. The parties agree on this much, and we affirm that these are the two avenues available for potentially rebutting the presumption of original priority.

¶36 Rocky Ford, however, labels both types of claims "impairment." Kents Lake, by contrast, refers only to protest during the change application process as an "impairment" claim. And it refers to a claim brought later on as an "interference" claim.

¶37 This confusion is understandable given our past cases, which have sometimes used the terms "impairment" and "interference" interchangeably.[17] But we agree with Kents Lake

---

today does not preclude the possibility that if that happens, Rocky Ford may be able to assert a successful interference claim based on such additional evidence. Today we simply hold that the evidence in the record *thus far* does not support a viable interference claim.

[17] *See, e.g.*, *Searle v. Milburn Irrigation Co.*, 2006 UT 16, ¶¶ 37, 39, 133 P.3d 382 (holding that "the courts are at all times fully empowered to protect vested rights from impairment" and that "the courts . . . remain open to water users whose rights face impairment" even after a change is approved); *Current Creek Irr. Co. v. Andrews*, 344 P.2d 528, 536 (Utah 1959) (Crockett, C.J., dissenting)

(continued . . .)

that these are distinct legal claims meriting distinct labels. We clarify that "impairment" claims are statutory claims brought under Utah Code sections 73-3-3 and 73-3-7 *during* the change application process, and that "interference" claims are common-law claims brought under our case law *after* the change application process ends. Though both are claims that allege injury to preexisting vested water rights, there are important differences between statutory *impairment* claims and common-law *interference* claims. And we think the differences are best captured by using the term "impairment" to refer to statutory claims brought during the change application process and the term "interference" to refer to common-law claims brought after the change application process.[18]

¶38 We suggested such a terminological distinction in our decision in *Wayment v. Howard*, 2006 UT 56, 144 P.3d 1147. There we referred to statutory claims available during the administrative application process as "impairment" claims. And we described the common-law claim at issue in that case (brought after the administrative application process) as one of "interference." *Id.* ¶¶ 9, 13 n.11. We thus clarified in *Wayment* that "impairment" and "interference" are distinct. *See id.* ¶ 9 ("A determination of interference, much like one of impairment, is best viewed as a mixed question of fact and law."); *id.* ¶ 13 n.11 ("While this may be true for impairment, we need not and do not reach the issue of whether we apply a de minimus [sic] standard to interference."). We maintain that distinction here, and clarify that "impairment" and "interference" are distinct claims available at different stages of the administrative and adjudicative process involving water

_____

(noting in an injunctive relief case the difficulty of knowing "whether [a new well] impaired the flow of others"); *Whitmore v. Murray City*, 154 P.2d 748, 750 (Utah 1944) (noting that the "state engineer did not adjudicate the priority . . . but merely determined that it could use the water . . . as long as it did not interfere with the prior rights of others").

[18] Today we speak only to the difference between statutory impairment claims and common-law interference claims. In so doing we do not address enforcement actions brought by the State Engineer under Utah Code section 73-2-25(2)(a) when she finds that a person "is diverting, impounding, or using water in violation of an existing water right."

rights. In so doing, we endorse the *Wayment* terminology as a matter of Utah water law going forward.

¶39 We do so for two main reasons. First, the distinction between "impairment" and "interference" is important to the extent it highlights the two distinct roles our courts play in water law cases: (1) reviewing administrative decisions regarding water rights,[19] and (2) adjudicating the water rights themselves (including their priority).[20] This court's review of impairment claims falls under the first category, while our review of interference claims falls under the second. This is because impairment refers to a plaintiff's protest of *proposed* changes (and appeal of State Engineer decisions on those proposed changes[21]), while interference refers to a plaintiff's petition for an adjudication of water rights (whether priority or otherwise) once an *approved* change causes actual harm. Because the changes have only been proposed during the application stage, the preliminary decision about whether there is "reason to believe" that they will injure vested rights is appropriately left to the State Engineer (with the opportunity for judicial review). *Searle*, 2006 UT 16, ¶¶ 2, 37. But once the changes are actually implemented and a water user can bring an interference suit, determining whether the changes actually injure vested rights "is a matter ultimately left to a final judicial determination of rights." *Id.* ¶ 37.

---

[19] *See Searle*, 2006 UT 16, ¶ 35 (explaining that when a district court "review[s] the state engineer's decision to approve or reject an application" it is "not sitting in its capacity as an adjudicator of rights," but rather as one "charged with ensuring that the state engineer correctly performed an administrative task").

[20] *See E. Bench Irr. Co. v. State*, 300 P.2d 603, 607 (Utah 1956) (holding that "the extent or priority of rights" an applicant hopes to acquire from a proposed change is an issue that "cannot be adjudicated on . . . an [administrative] appeal" because "no cause of action for the adjudication of such rights can accrue at that time"); *United States v. Dist. Ct.*, 242 P.2d 774, 777 (Utah 1952) (explaining that the relevant "statute[s] make[] no provision for the determination of the priorities of the applicant and the protestants or the extent of their rights," but "leave[] the adjudication of the rights . . . to the courts in another kind of proceeding").

[21] *See, e.g., Rocky Ford I* (reviewing the State Engineer's determination of an impairment claim); *see also supra* ¶ 6 n.5.

¶40 Second, our decision to preserve a distinction between statutory impairment and common-law interference is supported by the fact that different burdens of proof apply to each. At the change application stage, an *applicant* bears the burden of giving the State Engineer "*reason to believe*" that the proposed changes will not impair existing water rights. *See id.* ¶¶ 2, 34, 53 (emphasis added). And other water users may protest this showing by producing "either direct or circumstantial evidence that sufficiently undermines the applicant's showing that the use proposed can be accomplished without impairing vested rights." *Id.* ¶ 2; *see also* UTAH CODE § 73-3-7 (1953). By contrast, once the change application process ends, the burden is on the *opponent* of the change to show by a *preponderance of the evidence* that the change has interfered with its water rights. *See Searle*, 2006 UT 16, ¶¶ 38, 42 (explaining that the "preponderance standard" applies to "a final adjudication of rights," such as an interference claim). In sum, once the change application process ends, the burden of persuasion shifts from the applicant to the aggrieved party and the standard of proof increases from "reason to believe" to a "preponderance of the evidence."

¶41 The availability of claims both during and after the change application process is no accident. Nor is the difference in the applicable burden of proof. Our bifurcated system reserves the resources of parties, courts, and the State Engineer for those instances in which actual harm occurs to vested rights, which can be difficult to predict at the time of a change application.[22] Under this framework, water users can wait and see if a change actually injures their vested rights before deciding to assert a claim, rather than protest every application that could conceivably impact them out of an abundance of caution. And the fact that it's easier to propose changes than stop them encourages experimentation and innovation. *See id.* ¶ 36 (noting that the "reason to believe" standard is "a fairly low burden" which "balance[s] . . . the two policy goals of putting water to the most beneficial use possible while simultaneously guarding vested rights"). This lighter burden is possible because "courts [remain] at all times fully empowered to protect vested rights from [injury]" through the doctrine of interference. *Id.* ¶ 37.

_____

[22] Consider this case, which alleges harm from a change application approved nearly seventy years ago.

### b. Rocky Ford has failed to show that Kents Lake's direct storage changes have injured its rights

¶42 Kents Lake claims that Rocky Ford has waived any claim for statutory impairment by failing to protest during the change application process. And it notes that Rocky Ford waived its common-law interference claim for damages when that claim was dismissed with prejudice shortly before trial. Rocky Ford concedes as much. But it argues that it still has a viable common-law interference claim for *prospective* relief.[23]

¶43 We agree that Rocky Ford has waived both any impairment claim (by failing to protest during the change application process) and any interference claim for damages (by dismissing such a claim before trial). And we further find that any interference claim for prospective relief has not been proven on this record. So even though the district court erred in interpreting the 1953 Agreement to preclude *any* claim that might rebut the presumption that Kents Lake's direct storage changes retain their original priority, *see supra* ¶¶ 12, 26–27, we conclude that on this record there is no viable claim for injury. *See supra* ¶ 33 n.16 (noting that we are not foreclosing the possibility of the district court identifying a basis for the presentation of additional evidence on remand).

### i. Rocky Ford's impairment claim is waived

¶44 We first determine whether Rocky Ford has a viable impairment claim that could defeat the presumption that Kents Lake's direct storage changes retain their original priority over Rocky Ford's direct flow rights. We hold that Rocky Ford has waived any claim for impairment from Kents Lake's direct storage changes by not protesting Kents Lake's change application before the State Engineer.

¶45 As contracted for in the Agreement, Kents Lake applied for a changed use to convert part of its direct flow rights into a direct storage right. And true to the Agreement, Rocky Ford did not

---

[23] Of course, Rocky Ford referred to both claims (whether during the change application process or after) as "impairment" claims. *See supra* ¶ 36. But in the interest of clarity, we use "impairment" and "interference" as distinguished above in Part II(A)(3)(a).

protest the change. The change application was then approved by the State Engineer.

¶46 Rocky Ford now contends that the direct storage changes impair its rights. Of course, a changed use should not impair a vested right. *See* UTAH CODE § 73-3-3 (1953). But that does not give parties the right to claim impairment in perpetuity. An impairment claim must be raised during the protest period before the State Engineer, as explained above in Part II(A)(3)(a). And parties aggrieved by a decision the State Engineer makes must bring an action for plenary review within sixty days. *Id.* § 73-3-14 (1953); *see also supra* ¶ 39. Rocky Ford did not do so. Whether it *could not* (by virtue of the Agreement) or simply *did not* is irrelevant. Kents Lake went through the required administrative processes in both filing its application and in perfecting its right. And because Rocky Ford did not challenge the change application through the appropriate administrative mechanisms at the proper time, it is unable to claim impairment now.

### ii. Rocky Ford's interference claims are waived or not supported by the record

¶47 We next determine whether the presumption that Kents Lake's changes maintain their original priority is defeated by a valid *interference* claim. Rocky Ford brought such a claim for damages below. But this claim was dismissed with prejudice shortly before trial. Rocky Ford asserts, however, that it still has a viable interference claim for prospective relief. In fact, Rocky Ford pursued such a claim at trial—it asserted that Kents Lake's direct storage changes combined with Kents Lake's switch to sprinkler irrigation reduced the amount of water available for its direct flow rights, and that the changes should accordingly be given a reduced priority date to the extent of the injury.

¶48 The district court rejected this interference claim for prospective relief, finding that it failed to establish that any injury to Rocky Ford's direct flow rights was *caused* by Kents Lake's direct storage changes. Because Rocky Ford separately appealed this ruling, we consider it below in Part II(B). As explained there, we agree with the district court that Rocky Ford's interference claim for prospective relief is not supported by the record.

¶49 Rocky Ford thus has no viable claim for injury on the record before us on this appeal. Its statutory impairment claim and its interference claim for damages have both been waived. And its

interference claim for prospective relief is not supported by the record.[24]

### B. The District Court Did Not Err in Refusing to Declare that Kents Lake Cannot Store Its Efficiency Gains

¶50 We next consider whether the district court erred in refusing to declare in its final judgment that Kents Lake cannot use its direct storage changes to store the water it saves from improved irrigation efficiency. Rocky Ford sought this declaration based on an interference theory. *See supra* Part II(A)(3). And in that sense, the declaration it sought can be viewed as an application of the declaration of law it sought on summary judgment—that Kents Lake's direct storage changes maintain their senior priority only as long as they do not harm Rocky Ford's direct flow rights.

¶51 The district court declined to enter this declaratory judgment for Rocky Ford, concluding that Rocky Ford had failed to establish that any injury to its direct flow rights was caused by Kents Lake's direct storage changes, rather than by intervening causes. We agree that Rocky Ford has failed to establish causation on this record. And we affirm on that basis.[25]

_____

[24] Our analysis, of course, is based on the evidence in the record on appeal. And as noted above, we are not foreclosing the possibility that the district court may identify a basis for the presentation of additional evidence on remand—evidence that could sustain an interference claim in this case. *See supra* ¶ 33 n.16. Nor are we concluding that Rocky Ford is foreclosed from bringing an interference claim at any point in the future. We are simply holding that for any such claim to be successful, Rocky Ford would have to establish injury to its vested water rights *caused by* Kents Lake's direct storage changes.

[25] Kents Lake also asks us to affirm the district court's ruling on the ground that Rocky Ford has not alleged an actionable interference claim. Kents Lake contends that (1) any alleged injury to Rocky Ford's direct flow rights is based not on the direct changes themselves, but on the efficiency gains from its switch to sprinkler irrigation; and (2) such efficiency gains are not actionable because they are independent of the changes and the "the right to save water inheres in every water right" under Utah law. We do not reach these questions because we conclude that Rocky Ford has

(continued . . .)

¶52 Rocky Ford's direct flow rights are vested water rights it acquired prior to Kents Lake's direct storage changes. And now Rocky Ford claims that these rights have been injured by the direct storage changes. The interference alleged by Rocky Ford focuses on Kents Lake's direct storage changes combined with its switch to sprinkler irrigation. Kents Lake switched to sprinklers in the 1970s as a more efficient watering mechanism than flood irrigation—sprinklers use less water. And as a result of the direct storage changes, Kents Lake is able to store the excess water it had previously used on less efficient irrigation. If Kents Lake had only a direct flow right, as it did initially, the newly storable water (the efficiency gains) would continue flowing down the Beaver River. But the direct storage changes allow Kents Lake to store this excess water without creating larger return flows that would benefit downstream users like Rocky Ford.

¶53 Rocky Ford thus asserts that Kents Lake is no longer entitled to the original priority date for its changed use to the extent of this injury. It claims that Kents Lake's direct storage changes must receive a reduced priority—the date of the change application—to the extent those changes have reduced Rocky Ford's water supply to less than what Rocky Ford would have received without them. In Rocky Ford's view, in order for Kents Lake's direct storage changes to maintain their original priority, Kents Lake must forgo its storage of any efficiency gains.

---

failed to establish a causal link between Kents Lake's direct storage changes and any harm to Rocky Ford's direct flow rights.

For the same reason, we need not address a related question that the parties ask us to resolve: whether an upper user with a junior water right can use water more efficiently to the detriment of a lower user with a senior right. This factual scenario is made possible by the unique administration of the Beaver River Decree, which allows upper junior users to take water prior to lower senior users. *Supra* ¶ 4. And it is relevant here because some of Rocky Ford's direct flow rights have an 1870 priority that is senior even to the unaltered 1890 priority of the Kents Lake's direct storage right. *Supra* ¶ 4. But again, because Rocky Ford has failed to produce evidence establishing the threshold requirement of a causal link between its alleged injury and Kents Lake's direct storage changes, there is no need to explore how the Beaver River Decree might affect how a successful interference claim would play out in this circumstance.

¶54 In support of this theory Rocky Ford introduced evidence at trial suggesting that its return flows have been reduced. One of its experts testified that there is "a very strong likelihood" that there was "impact on the return flows" from "the conversion from flood to sprinkler irrigation" which affected Rocky Ford. Despite this evidence, the district court found that Rocky Ford had not sufficiently distinguished or accounted for either the potential impact of groundwater pumping or the conversion to sprinkler irrigation by users *other than* Kents Lake on Rocky Ford's return flows.[26]

¶55 We agree with the district court that Rocky Ford has failed to adequately establish causation. While Rocky Ford may be right that its return flows have been reduced, we share the district court's concern that Rocky Ford didn't sufficiently account for the potential impact of groundwater pumping and efficiency gains by users *other than* Kents Lake on its return flows. Because it is unclear from the record whether Kents Lake's direct storage changes actually *caused* injury to Rocky Ford's direct flow rights (through reduced return flows), we lack a sufficient basis in the record to conclude that Rocky Ford has carried its burden of showing interference.

¶56 Rocky Ford has thus failed to show that the direct storage changes "in natural and continuous sequence[] (unbroken by an efficient intervening cause)[] produce[d] the injury," and that "without [them] the result would not have occurred." *Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶ 27 n.40, 356 P.3d 1172 (citation omitted). We affirm on that basis. We conclude that Rocky Ford failed to carry its burden of proof at trial, and thus conclude that the district court did not err in refusing to declare that Kents Lake cannot store its efficiency gains using the direct storage changes.

¶57 Without proof from Rocky Ford that Kents Lake's storage of efficiency gains *caused* Rocky Ford's alleged injury (reduced return flows), we have no occasion to render a ruling on a further

---

[26] The district court's denial of Rocky Ford's motion for summary judgment precluded most evidence concerning the priority of the direct storage changes, including evidence from Rocky Ford's expert about the impact of sprinklers on the historical return flows to the Beaver River. But Rocky Ford may be in a position to identify a basis for introducing the excluded evidence either on remand or in an interference claim in a future proceeding.

point of dispute between the parties on this appeal—the effect of a successful interference claim on the priority date for Kents Lake's direct storage changes.[27] A successful interference claim is prerequisite to any remedy for interference—including a change in priority. *See supra* Parts II(A)(2)–(3). Unless and until Rocky Ford carries its burden of establishing a factual basis for an interference claim, we have no occasion to opine on the effect of any such claim on the priority date of Kents Lake's direct storage changes. So on this record, we hold that Kents Lake's direct storage changes retain their original 1890 priority date.

## C. The District Court Erred in Refusing to Declare that Kents Lake Must Abide By its Measurement Obligations Under the Beaver River Decree

¶58 The third question presented for our review pertains to Kents Lake's obligations to measure its water use in accordance with the Beaver River Decree. In the proceedings below, Rocky Ford sought both declaratory and injunctive relief, asking the court to clarify Kents Lake's measurement obligations. Rocky Ford contended that Kents Lake does not have the measurement devices necessary to satisfy its measurement obligation under the Beaver River Decree. The district court denied Rocky Ford's requests and Rocky Ford now seeks reversal of those decisions. We affirm the district court's denial of Rocky Ford's request for injunctive relief. But we reverse and remand to the district court for further determinations on the declaratory judgment.

¶59 Rocky Ford asks us to reverse the district court's decision denying its request for injunctive relief. But Rocky Ford's briefing does not adequately address the decision before us on appeal. The district court held that Rocky Ford had failed to carry its heavy

---

[27] Rocky Ford asks us to hold that a successful interference claim would *require* a court to burden the changed right with the date of the change application. Kents Lake offers a different view, insisting that a reduced priority is simply one of many remedies *available* to a district court when a successful interference claim is brought. We do not resolve this dispute here. We reserve it for a case in which it is squarely presented.

burden of proof.[28] Specifically, the district court said that Rocky Ford was unable to show that it had suffered irreparable harm resulting from Kents Lake's failure to fulfill its measurement obligations under the Decree. On appeal, Rocky Ford has not adequately addressed the standard for entry of injunctive relief or sufficiently explained how the district court erred under that standard. We thus affirm the lower court's denial of injunctive relief under our case law requiring an appellant to speak specifically to the terms of an order challenged on appeal. *See Utah Physicians for a Healthy Env't v. Exec. Dir. of the Utah Dep't of Envtl. Quality*, 2016 UT 49, ¶ 16, 391 P.3d 148 (holding that an appellant's failure to address and brief arguments directed at the order under review on appeal was fatal to the appeal).

¶60 This defect does not extend to Rocky Ford's request for declaratory relief, however. Under Utah Code section 78B-6-402, a party seeking declaratory relief need show only by a preponderance of the evidence that the requested relief will terminate an alleged controversy or remove an uncertainty. Rocky Ford alleges confusion amongst the parties as to the measurement obligations under Utah Law and the Beaver River Decree. And Rocky Ford sought a declaratory judgment clarifying these responsibilities.

¶61 In denying Rocky Ford's request for relief, the district court stated that "Kent's Lake asserts that it has consistently done whatever the State Engineer or his agent has asked it to do." And it stated that "the State appears satisfied with Kent's Lake." But the district court did not explain how this compliance with the State Engineer's orders excuses a lack of compliance with the terms of the Beaver River Decree. And we see no reason to so conclude.

¶62 The State Engineer is tasked with the "general administrative supervision of the waters of the state and the measurement, appropriation, apportionment, and distribution of those waters." *Id.* § 73-2-1(3)(a). But our law mandates that "a

---

[28] "A court may grant a permanent injunction if it determines that (1) the petitioner establishes standing by demonstrating special damages, (2) the petitioner has a property right or protectable interest, (3) legal remedies are inadequate, (4) irreparable harm would result, (5) court enforcement is feasible, and (6) petitioner merits the injunction after balancing the equities." *Johnson v. Hermes Assocs., Ltd.*, 2005 UT 82, ¶ 13, 128 P.3d 1151 (footnote omitted).

person using water in this state . . . shall construct or install and maintain controlling works and a measuring device at: (a) each location where water is diverted from a source." *Id.* § 73-5-4(1). This obligation is independent from and in addition to the duty to install and use measuring devices at "any other location required by the state engineer." *Id.* In this case, the party's measurement obligations are further clarified in the 1931 Beaver River Decree. The Decree says, "the parties hereto and their successors in interest shall promptly install and perpetually maintain suitable and efficient headgates, control works and measuring devices at or near as possible to their respective points of diversion."

¶63 Kents Lake does not dispute that the Beaver River Decree and Utah Code section 73-5-4 require installation of "measuring devices at or near as possible to their respective points of diversion." Nor does Kents Lake dispute that there is no such measuring device at multiple points of diversion into its reservoirs. It instead argues that all measurement required under statute and the Beaver River Decree is to benefit the State Engineer in administering the river. So Kents Lake claims that by complying with the State Engineer it has necessarily discharged any duties required of it by statute or the Decree.

¶64 We disagree. Our law creates an independent obligation to measure. *See id.* § 73-5-4(1)(a) (requiring parties to install and maintain measurement devices at each location where water is diverted); *see also Gunnison Irr. Co. v. Peterson*, 280 P. 715, 717 (Utah 1929) ("If the defendant violated the terms of the decree, he cannot purge himself of the contempt by showing that no commissioner was appointed."). That obligation exists regardless of whether a party complies with the requests of the State Engineer. This is Rocky Ford's point. It acknowledges that Kents Lake may have complied with instructions from the State Engineer. But it disagrees that this releases Kents Lake from any independent obligation to measure water in accordance with statute or the Decree.

¶65 We agree with Rocky Ford. Parties have an independent duty to fulfill measurement obligations. Rocky Ford does not seek damages for past mismeasurement or wrongful storage, which would require us to decide whether following the State Engineer's direction insulates a water user from claims of damages. Rocky Ford instead asks for clarification moving forward. We find that the clarification it seeks is warranted, and remand to the district court to interpret the parties' measurement obligations under Utah Code

section 73-5-4 and the Beaver River Decree, and enter a declaratory judgment clarifying these obligations.

## D. The District Court Did Not Err in Refusing to Rescind the 1953 Agreement

¶66 Rocky Ford also appeals the district court's decision not to rescind the 1953 Agreement. This question implicates two sub-issues. First, did the district court err in refusing to rescind the 1953 agreement on the basis of a material breach? And second, did the district court abuse its discretion when it refused to admit certain evidence Rocky Ford claims was relevant to the rescission claim? We answer both questions in the negative, and affirm.

### 1. Material Breach

¶67 Rocky Ford alleges two material breaches of the 1953 Agreement. The Agreement provides that "Rocky Ford has exclusive right to store all water during the non-irrigation season." But Kents Lake closed the gates of its South Fork Reservoirs in the winter, capturing any inflows and preventing them from reaching Rocky Ford. Kents Lake also failed to comply with the measurement obligations outlined in the 1953 Agreement. Rocky Ford argues that these are "uncured material failure[s] sufficient to render the contract unenforceable." *Aquagen Int'l, Inc. v. Calrae Tr.*, 972 P.2d 411, 414 (Utah 1998) (internal quotation marks omitted).

¶68 We disagree and affirm on the ground that the alleged breaches were not material.

¶69 The materiality of a contract term is a "fact-like mixed question[]" that is reviewed "deferentially." *Sawyer v. Dep't of Workforce Servs.*, 2015 UT 33, ¶ 11, 345 P.3d 1253. And "rescission is not warranted" where a breach does not "defeat the object of the parties in making the agreement." *Cross v. Olsen*, 2013 UT App 135, ¶ 27, 303 P.3d 1030 (citation omitted). The district court permissibly concluded that Rocky Ford's claimed material breaches did not go to the object of the Agreement. A principal object of the Agreement was to protect new interests. Specifically, it was to ensure that Rocky Ford would not protest Kents Lake's proposed change application and to ensure that Kents Lake would not oppose Rocky Ford's enlargement of its reservoir. While the Agreement restated Kents Lake's measurement obligations and Rocky Ford's exclusive winter storage rights, the district court could permissibly conclude that the object was not to reaffirm prior obligations both parties already had. Both parties acknowledge that these obligations pre-date the Agreement.

¶70 The object of the Agreement was for Rocky Ford to enlarge its reservoir and for Kents Lake to apply for the change application free from Rocky Ford's protest. Because Kents Lake's alleged breaches do not go to material terms of the Agreement, the district court acted within the bounds of its discretion in determining that the breaches were not material and declining to rescind the Agreement on this ground.

2. Evidence

¶71 Rocky Ford also claims that the district court erred in excluding evidence that allegedly supported Rocky Ford's rescission claim. We "afford district courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (citation and internal quotation marks omitted). And we will not determine that the district court abused its discretion unless its "decision exceeds the limits of reasonability." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). We do not believe that the district court's exclusion of evidence here "exceeds the limits of reasonability." *See id.* We accordingly affirm the exclusion of the evidence in question.

¶72 The district court found that testimony about historical return flows to the Beaver River was irrelevant. Rocky Ford challenges that decision. It asserts that evidence of historical return flows would have enabled it to prove impracticability, frustration of purpose, or mutual mistake as a basis for rescission. And it contends that the district court committed reversible error in excluding evidence of historical return flows.

¶73 We disagree with Rocky Ford and affirm. The district court's ruling on the rescission claim was not based on Rocky Ford's lack of evidence regarding return flows. To the contrary, the court found that the 1953 Agreement had "nothing to do with return flows." The court supported this conclusion by correctly noting that the Agreement is silent as to runoff, return flows, and Rocky Ford's position as a downstream water user. Each of Rocky Ford's alleged rescission theories required a finding that return flows were so fundamental to the Agreement that their reduction would have made the Agreement unenforceable.[29] And the district

---

[29] Rescission of a contract is an exceptional remedy that must be supported by exceptional facts. Rocky Ford asserted three theories

(continued . . .)

court concluded that this was not the case, regardless of what any evidence of return flows showed.

¶74 The district court did hold that Rocky Ford failed to provide sufficient evidence on a number of other issues. But it ultimately rejected Rocky Ford's rescission claim on the ground that Rocky Ford could not prove that return flows were relevant to the Agreement. In so doing the district court acted within its discretion. We thus affirm the district court's exclusion of Rocky Ford's evidence and its decision to not rescind the 1953 Agreement.

### E. The District Court Erred in Awarding Attorney Fees

¶75 The final issue on appeal concerns the district court's award of attorney fees. After trial, the court *sua sponte* awarded attorney fees to Kents Lake and Beaver City under Utah Code section 78B-5-825 based on the determination that Rocky Ford's claims were "without merit and not brought or asserted in good faith." Rocky Ford challenged the award of attorney fees in a rule 59 motion. That motion was denied. Rocky Ford now asks us to reverse the court's denial of that motion and its award of attorney fees. It contends that the district court erred when it determined that Rocky Ford's claims lack merit and were brought in bad faith.

—————————————————————————————————————————

in support of its claim for rescission: impracticability, frustration of purpose, and mutual mistake. Impracticability requires "an unforeseen event [that] occurs after formation of the contract . . . which event makes performance of the obligation impossible or highly impracticable." *Cent. Utah Water Conservancy Dist. v. Upper E. Union Irr. Co.*, 2013 UT 67, ¶ 28, 321 P.3d 1113 (citation omitted). "Frustration of purpose differs from the defense of [impracticability] only in that performance of the promise, rather than being impossible or impracticable, is instead pointless." *W. Props. v. S. Utah Aviation, Inc.*, 776 P.2d 656, 659 (Utah Ct. App. 1989). And mutual mistake requires that "at the time the contract is made, the parties make a mutual mistake about a material fact, the existence of which is a basic assumption of the contract." *Workers Comp. Fund v. Utah Bus. Ins. Co.*, 2013 UT 4, ¶ 27, 296 P.3d 734 (citation omitted). Each of these theories is thus premised on the notion that the fact giving rise to a claim for rescission goes to a material contract term. Yet return flows and runoff were not material to the Agreement. And the district court accordingly concluded that none of Rocky Ford's theories were legitimate grounds for rescinding the contract.

¶76 Utah Code section 78B-5-825(1) calls for an award of attorney fees in civil actions when "the court determines that the action or defense to the action was without merit and not brought or asserted in good faith." This provision requires proof on "two distinct elements"—a determination that the losing party's claim was "(1) without merit, and (2) not brought or asserted in good faith." *In re Discipline of Sonnenreich*, 2004 UT 3, ¶ 46, 86 P.3d 712.

¶77 A determination under the first element will typically turn on a conclusion of law—whether the losing party's claim lacks a "basis in law or fact." *Id.* ¶ 47 (citation omitted). Such a determination is reviewed for correctness. *Id.* ¶ 45. The second element, by contrast, implicates fact-intensive questions about the losing party's "subjective intent." *Id.* ¶ 49. A party's good faith may be established by proof of "[a]n honest belief in the propriety of the activities in question;" a lack of "intent to take unconscionable advantage of others;" and a lack of "intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *Id.* ¶ 48 (alteration in original) (citation omitted). A lower court's findings on this element typically will be afforded a substantial measure of discretion. *Id.* ¶ 45.

¶78 The district court made *sua sponte* findings on the two elements of the statute. Ordinarily we would yield substantial deference to the court's findings on the latter. But we decline to do so here for two reasons. As an initial matter, the district court's findings are infected by legal error. Specifically, the court conflated the two elements of the statute by suggesting that Rocky Ford's claims were not asserted in "good faith" *because* they were "without merit." Most of the district court's "findings" on the lack of "good faith" are premised on the court's observations about the lack of merit in Rocky Ford's claims. But the two elements are distinct. It is reversible error to "conflate" them. *Id.* ¶ 49 (explaining that "the mere fact that an action is meritless does not necessarily mean that the action is also brought in bad faith"). And a threshold legal error is an abuse of discretion that undercuts the deference we would otherwise afford to the district court. *Goggin v. Goggin*, 2011 UT 76, ¶ 26, 267 P.3d 885 ("An error of law by the district court . . . would be an abuse of discretion.").

¶79 The district court did make two "findings" in a way that seems to treat the "good faith" inquiry as distinct. It faulted Rocky Ford for dismissing a claim against the Division of Water Rights—concluding that Rocky Ford allowed this claim to be dismissed for "no apparent reason." And it criticized Rocky Ford for not "suing

all well owners and upstream users, who might be switching from flood irrigation to sprinkler irrigation." These "findings," however, are too short on detail and too disconnected from the legal standard of "good faith" to merit deference on appeal.

¶80 This is the second basis for our decision not to defer to the district court's findings. We acknowledge the difficult job our district court judges have. We recognize that the many demands on their time make it difficult for them to always enter detailed findings on every fact-intensive decision they may make. Detailed findings, moreover, are not always strictly required. But a lack of detail in a lower court's findings will make it more difficult for us to afford deference. When detail is lacking, we may not be able to understand the discretion that was exercised by the court below. And for that reason we may not be in a position to afford the level of deference we otherwise would. *Gardner v. Gardner*, 2019 UT 61, ¶ 63 n.58, 452 P.3d 1134 (explaining that without detailed findings of fact "it will be difficult for an appellate court to determine whether the district court's ultimate . . . determination was within its discretion").

¶81 This is the position in which we find ourselves here. We see no apparent basis in the record for attributing bad faith to Rocky Ford for dismissing a claim against the Division of Water Rights or for declining to pursue claims against "well owners" or "upstream users" who "might be switching from flood irrigation to sprinkler irrigation." Maybe Rocky Ford did lack a good reason for those decisions. But the district court never explained how those decisions indicated that Rocky Ford's claims against Kents Lake were brought in bad faith. And without some explanation on the face of the district court's order, we find no basis for deferring to that determination.

¶82 With no basis for deference, we reverse the award of attorney fees. Some of Rocky Ford's claims have admittedly failed on their merits. But we find no basis for a determination that Rocky Ford filed or pursued its claims in bad faith. For that reason, we reverse the district court's denial of Rocky Ford's rule 59 motion and its award of attorney fees to Kents Lake and Beaver City.

### III. CONCLUSION

¶83 We reverse in part and affirm in part on the grounds set forth above. And we remand for further proceedings consistent with this opinion, including proceedings aimed at clarifying the

measurement obligations of the parties under the Beaver River Decree.

————————