**2019 UT App 119**

## THE UTAH COURT OF APPEALS

JAY MERVIN THOMPSON, LORI G. THOMPSON, AND
CINDY THOMPSON,
Appellees,
*v.*
MICAH CAPENER AND SHAYLEE CAPENER,
Appellants.

Opinion
No. 20180333-CA
Filed July 11, 2019

First District Court, Logan Department
The Honorable Kevin K. Allen
No. 170100152

Bradley H. Bearnson, Aaron K. Bergman, and
Wayman M. Stodart, Attorneys for Appellants

Brad C. Smith and Elizabeth A. Knudson, Attorneys
for Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1　Micah and Shaylee Capener own certain real property (Lots 1A and 1B) in Tremonton, Utah, which is part of the Garfield Estates Subdivision–Phase 1 (Subdivision). Jay, Lori, and Cindy Thompson, also property owners who reside in the Subdivision, brought this breach of contract action to enforce against the Capeners certain protective covenants (Covenants) encumbering the Subdivision. The Capeners filed a motion for summary judgment, asserting a statute of frauds defense that the Covenants are not enforceable against Lots 1A and 1B because they were not signed by one of the then owners of Lot 1—the

larger parcel that was subsequently subdivided into Lots 1A and 1B. The district court denied the Capeners' motion, concluding that the Covenants are enforceable against Lots 1A and 1B because the statute of frauds was satisfied by other writings or alternatively because the previous owner had ratified the Covenants. We reverse.

BACKGROUND[1]

¶2 The Subdivision contains seven lots, one of which was Lot 1. In May 2005, June C. Garfield (June) conveyed Lot 1 to Bradley H. Garfield (Brad).[2] Brad then conveyed Lot 1 to himself and Susan Garfield (Susan) as joint tenants. In June 2006, the Covenants—which purported to encumber all seven lots in the Subdivision—were signed by June and Brad, but not by Susan. The Covenants were recorded on June 12, 2006. At no time did Susan sign the Covenants.

¶3 In April 2014, Micah Capener entered into a real estate purchase contract with Brad and Susan to purchase Lot 1. Lot 1 was then further subdivided creating separate lots designated 1A and 1B. An amended plat evidencing the subdivision was signed by Brad and Susan and recorded on July 2, 2014 (Amended Plat). On July 23, 2014, Brad and Susan executed

---

1. Because this is an appeal from summary judgment, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (cleaned up).

2. As is our practice, when relevant persons share a last name, we sometimes refer to them by their first names with no disrespect intended by the apparent informality.

warranty deeds conveying Lots 1A and 1B to Micah Capener (Warranty Deeds). The Warranty Deeds stated that the conveyance was made "[s]ubject to easements, restrictions, and rights of way appearing of record and enforceable in law" (Habendum Clause). Capener thereafter conveyed Lots 1A and 1B to himself and Shaylee Capener as co-trustees of their revocable living trust.

¶4　　On May 2, 2017, the Thompsons filed this action for breach of contract, alleging that the Covenants were enforceable against Lots 1A and 1B and that the Capeners had violated the Covenants.[3] The Capeners filed a motion for summary judgment, asserting that the Covenants were unenforceable against Lots 1A and 1B because Susan had never signed them.

¶5　　The district court denied the Capeners' motion for summary judgment and ruled that the Covenants were enforceable against Lots 1A and 1B. The court concluded that "[w]here the . . . [Warranty Deeds] and [Amended Plat] all impliedly reference the . . . Covenants, and the two deeds executed by [Brad and Susan] contain both their signatures, it is clear there is a nexus and it was [Brad and Susan's] intention that Lots 1A and 1B would be subject to the Covenants." Alternatively, the court concluded that in signing the Amended Plat and Warranty Deeds, Susan ratified Brad's actions in creating the Covenants because "there is every indication [she] was aware of the . . . Covenants . . . [and] could have provided that she did not wish the [S]ubdivision, let alone Lots 1A and 1B, to be subject to" the Covenants. The district court went on to state that based on "subsequent writings bearing both [Brad's

_____

3. Although not clear in the record, at oral argument both sides acknowledged that the claimed violations were, at least in part, related to the Capeners' desire to keep certain livestock on Lots 1A and 1B.

and Susan's] signatures . . . [Susan] clearly ratified [Brad's] actions in creating" the Covenants.

¶6     The Capeners petitioned for interlocutory appeal from the denial of their motion for summary judgment. We granted the petition.


ISSUE AND STANDARD OF REVIEW

¶7     The Capeners contend that the district court denied their motion for summary judgment in error because the statute of frauds was not satisfied and that the Covenants are therefore unenforceable against Lots 1A and 1B as a matter of law. "Summary judgment is only appropriate if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Arnold v. Grigsby*, 2018 UT 14, ¶ 8, 417 P.3d 606 (cleaned up). "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness." *Id.* (cleaned up). And "the applicability of the statute of frauds is a question of law to be reviewed for correctness." *Bennett v. Huish*, 2007 UT App 19, ¶ 25, 155 P.3d 917 (cleaned up).


ANALYSIS

¶8     It is undisputed in this case that Susan did not sign the Covenants. Likewise, neither party disputes that this fact, taken alone, would render the Covenants unenforceable against Lots 1A and 1B under Utah's statute of frauds. *See* Utah Code Ann. § 25-5-1 (LexisNexis 2013); *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 629 (Utah 1989). What is squarely in dispute, however, is whether other writings—specifically the Warranty Deeds and the Amended Plat—signed by Susan satisfied the statute of frauds or otherwise indicated that she

ratified the Covenants. We discuss the statute of frauds and ratification in turn.

## I. Statute of Frauds[4]

¶9      "Because covenants that run with the land must be based on some interest in land, the statute of frauds must be satisfied." *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 629 (Utah 1989); *see also* Utah Code Ann. § 25-5-1 (LexisNexis 2013). The statute of frauds requires a written memorandum of an agreement relating to real property that is executed by all the joint owners of the property. *See Flying Diamond*, 776 P.2d at 629. Utah courts have also held that "one or more writings, not all of which are signed by the party to be charged, may be considered

___

4. The Thompsons urge us to affirm on the ground that the Capeners waived the statute of frauds defense. Early in the case, the Thompsons filed a motion for a temporary restraining order (TRO) alleging that "[e]very lot in [the Subdivision] is subject to" the Covenants. The Capeners, in their opposition, admitted this allegation, but "solely for the purpose of th[at] motion." The Thompsons now argue that this admission constitutes a categorical waiver of the statute of frauds defense. We disagree. To be sure, we recognize that if a party concedes or fails to dispute facts in a number of circumstances, waiver can be found. But this is not one of those circumstances. The Capeners expressly qualified that their admission was solely for the purpose of the Thompsons' TRO motion. Not only do we decline to establish precedent that would discourage parties from making admissions for the limited purpose of a given motion, but we encourage litigants to do so when reasonable. If a party determines that a fact is immaterial or would muddy the water in any given motion, we see no harm in conditionally admitting that fact to promote efficiency in resolving that particular motion. And a party should not be punished for doing so.

together as a memorandum if there is a nexus between them."
*Reynolds v. Bickel*, 2013 UT 32, ¶ 17, 307 P.3d 570 (cleaned up). A
nexus "is indicated by express reference in the signed writing to
the unsigned one, or by implied reference gleaned from the
contents of the writings and the circumstances surrounding the
transaction." *Id.* ¶ 18 (cleaned up). A nexus under the latter
instance exists if

> all the writings adduced, viewed together in light
> of the situation and circumstances of the parties at
> the time they were written, show unmistakably
> that they relate to the same matter, and constitute
> several parts of one connected transaction, so that
> the mind can come to no other reasonable
> conclusion from the evidence so offered than that
> they were each written with reference to those
> concurrent or preceding.

*Gregerson v. Jensen*, 617 P.2d 369, 373 n.6 (Utah 1980) (cleaned
up).

¶10　The facts in *Gregerson* illustrate when multiple writings
can be construed together to satisfy the statute of frauds. In
*Gregerson*, the plaintiff orally agreed to purchase real property
from the defendant for $700. *Id.* at 370. The plaintiff thereafter
delivered a signed check for half of the purchase price that
contained the notation "1/2 payment on land as agreed-other 1/2
payment when deed delivered." *Id.* at 373 (cleaned up). A deed
was prepared listing the plaintiff as grantee and the defendant as
grantor, but that deed was never signed by either party. *Id.* at
371–72. The district court later dismissed the plaintiff's case for
specific performance on the sale of the land because the deed
was unsigned and therefore did not comply with the statute of
frauds. *Id.* at 372. Our supreme court disagreed, concluding that
"while not referring expressly to a specific deed, the notation on
the check evidences the expectations of the parties that a deed

would be involved in the transaction." *Id.* at 373. The deed also expressly listed the parties to the transaction and the description of the subject property. *Id.* Accordingly, the court determined that "the two writings evidence a single transaction and should be read together as fulfilling the requirements of the Statute of Frauds." *Id.*

¶11　Here, the parties do not dispute that neither the Amended Plat nor the Warranty Deeds contains an express reference to the Covenants. Accordingly, for the Amended Plat and/or Warranty Deeds to have a nexus with the Covenants sufficient to satisfy the statute of frauds, they must "unmistakably . . . relate to the [Covenants], and constitute several parts of one connected transaction, so that the mind can come to no other reasonable conclusion" but that Susan intended to be a party to and execute the Covenants. *See id.* at 373 n.6 (cleaned up). We conclude that no such nexus exists here.

¶12　First, we disagree with the district court's conclusion that the Amended Plat "recognizes" the Covenants. While the Amended Plat contains references to a "private road access easement" and public utility easements, there is simply no mention of covenants, much less the specific Covenants at issue here. The Amended Plat was also signed approximately eight years after the Covenants were signed and recorded. Thus, the Amended Plat evidences a different transaction, the subdivision of Lot 1. We therefore conclude that the Amended Plat lacks a sufficient nexus with the Covenants to satisfy the statute of frauds.

¶13　Second, the Warranty Deeds also lack a sufficient connection to the creation of the Covenants. *See id.* (stating that "writings adduced . . . [must] show unmistakably that they relate to the same matter, *and* constitute several parts of one connected transaction" (emphasis added) (cleaned up)). The Thompsons, on appeal, presented extensive briefing and oral

argument concerning whether the Warranty Deeds impliedly reference the Covenants vis-à-vis the word "restrictions" found in the Habendum Clause. This argument, however, does nothing to show that the Warranty Deeds and Covenants "constitute several parts of one connected transaction." *See id*. (cleaned up). Moreover, in this case, the Habendum Clause does not cause the mind to come to no other conclusion but that Susan intended the Covenants to be enforceable against Lots 1A and 1B. The Habendum Clause is boilerplate language that could mean many different things, and similar language is likely found in most warranty deeds. Accordingly, this vague reference to "restrictions" in the Habendum Clause does not create a nexus sufficient to satisfy the statute of frauds. Like the Amended Plat, the Warranty Deeds were signed eight years after the Covenants and evidence a discrete transaction that is wholly unrelated to the creation of the Covenants: the conveyance of Lots 1A and 1B from Brad and Susan to Micah Capener. Therefore, we conclude that, despite the reference to "restrictions," the Warranty Deeds do not constitute separate writings connected to a single transaction that satisfy the statute of frauds.

¶14 Third, the district court's statute of frauds analysis was flawed because it relied on circumstances surrounding other transactions that were unrelated to the creation of the Covenants. In its ruling, the court correctly stated that it "can look at all the circumstances surrounding the creation of" the Covenants. The analysis that followed, however, related to the circumstances surrounding the creation of the Amended Plat, the Warranty Deeds, and the Capeners' conveyance of Lots 1A and 1B to themselves as co-trustees. Not only did these events occur over eight years after the creation of the Covenants, but these events were separate transactions that did not constitute "writings [that] evidence a single transaction and should be read together as fulfilling the requirements of the Statute of Frauds." *Id*. at 373.

¶15 The standard under *Gregerson* requires that the writings and circumstances taken together "unmistakably" show they are related to a single transaction so that "no other reasonable conclusion" from the evidence can be made. Even giving every reasonable inference to the Thompsons, the facts before the district court fail to meet this standard. We therefore conclude that summary judgment on this issue was denied in error.

## II. Ratification

¶16 Ratification on these facts similarly fails as a matter of law. "A principal may impliedly or expressly ratify an agreement made by an unauthorized agent." *Bradshaw v. McBride*, 649 P.2d 74, 78 (Utah 1982). However, "ratification requires the principal to have knowledge of all material facts and an intent to ratify." *Id.* Here, the district court erred by relying on the Amended Plat and Warranty Deeds to determine that Susan had "knowledge of all material facts and an intent to ratify." *See id.* As discussed above, *supra* ¶¶ 12–14, these documents are wholly unrelated to the creation of the Covenants, do not make reference to the Covenants, and do not contain any material facts about the Covenants. Further, even if the Amended Plat and Warranty Deeds did make Susan aware of the Covenants generally—a fact not apparent in this record—that fact still falls short of showing that Susan intended to ratify Brad's signing the Covenants on her behalf.

¶17 Similarly, the district court erred in concluding that Susan ratified by silence when she did nothing to disaffirm the Covenants. Although "[u]nder some circumstances failure to disaffirm may constitute ratification of the agent's acts," *Bradshaw*, 649 P.2d at 78, "the same kind of authorization that is required to clothe an agent initially with authority to contract must be given by the principal to constitute a ratification of an unauthorized act," *id.* at 79. In other words, "[w]here the law

requires the authority to be given in writing, the ratification must also generally be in writing." *Id.* Accordingly, where the Covenants are subject to the statute of frauds, Susan could not, as a matter of law, ratify the Covenants by silence.

¶18 Finally, the factual statements of the parties do not otherwise support any inference of Susan's intent to ratify. The only reference to Susan found in any of the statements of fact note that her signature merely appears on the Warranty Deeds and Amended Plat referenced above. There are no other facts showing Susan's awareness of the Covenants, nor are any facts indicative of any circumstances where Susan acknowledged the existence of, or remained silent concerning, the Covenants under circumstances where one in her position would be expected to respond. Accordingly, we cannot agree that the parties' statements of fact indicate any awareness by Susan of the Covenants or her intentions regarding their applicability to Lot 1, which became Lots 1A and 1B.

¶19 Where neither Susan's silence nor the other writings support any inference that Susan (1) had knowledge of all material facts relating to the Covenants, (2) intended to ratify the Covenants, or (3) ratified, in writing, Brad's act of executing the Covenants on her behalf, we conclude that Brad's signing of the Covenants was not ratified by Susan and therefore summary judgment was erroneously denied on that ground.

CONCLUSION

¶20 We conclude that the other writings offered in this case do not have a nexus with the creation of the Covenants sufficient to satisfy the statute of frauds. We further conclude that the facts and arguments presented on summary judgment below lack a sufficient basis to show that Brad's signing of the Covenants was ratified by Susan. Therefore, summary judgment in this case was

denied in error, and we reverse and remand for further proceedings consistent with this opinion.[5]

―――――――

―――――――

5. The Thompsons also ask us to affirm on grounds that the facts and circumstances in this case establish an equitable servitude. The district court did not make any ruling under this theory, and factual issues remain as to whether an equitable servitude exists. Therefore this issue remains outstanding and should be addressed by the district court in the first instance on remand.