**2022 UT App 11**

## THE UTAH COURT OF APPEALS

DEBORAH J. FRITSCHE AND R. WINSLOW WHITE,
Appellants and Cross-appellees,
*v.*
DEER VALLEY RIDGE AT SILVER LAKE ASSOCIATION OF UNIT
OWNERS AND ALPINE SKI PROPERTIES INC.,
Appellees and Cross-appellants.

Opinion
No. 20200411-CA
Filed January 21, 2022

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
The Honorable Kent Holmberg
No. 180500567

Troy L. Booher, Beth E. Kennedy, and Taylor Webb,
Attorneys for Appellants and Cross-appellees

John H. Romney, Daniel E. Young, and Rick L.
Frimmer, Attorneys for Appellees and Cross-
appellants Deer Valley Ridge at Silver Lake
Association of Unit Owners

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1     This case started when a misplaced sprinkler allegedly caused a few thousand dollars in damages to a Park City condominium. The condominium was owned by a trust, and the trust later sued its condominium association for damages stemming from the incident. In its suit, the trust not only asked for the costs of the repairs, but also for "punitive damages and attorney fees and costs" that "may exceed $300,000."

¶2    The parties initially settled out of court. But when the condominium association asked the district court to enforce the settlement agreement, the trust argued that the agreement was unenforceable. The court rejected that argument and ruled that the agreement was enforceable. When the condominium association then asked the court to award it attorney fees, the court denied that request too.

¶3    Both sides now appeal. For the reasons set forth below, we affirm both rulings.


BACKGROUND

*The Lawsuit*

¶4    Deborah J. Fritsche and R. Winslow White (the Trustees) are the trustees of the Deb & Win Trust (the Trust). The Trust owns a condominium unit in the Deer Valley Ridge at Silver Lake condominium project. As a unit owner, the Trust is a member of the condominium project's Association of Unit Owners (the Association). For many years, one of the Trustees (either Fritsche or White) served, by election of the unit owners, on the Association's management committee. The management committee was a subset of unit owners authorized "to make and to enforce all of the reasonable rules and regulations covering the operation and maintenance of the [condominium project]."

¶5    The Association hired a property management company, Alpine Ski Properties (Alpine), to maintain common areas. In 2019, the Trust sued the Association and Alpine, alleging that the Association and Alpine were responsible for damage to the Trust's condominium stemming from a misplaced sprinkler. The Trust claimed $4,100 in actual damages, and it also claimed that it was entitled to punitive damages, attorney fees, and costs that "may exceed $300,000."

¶6     In response, the Association filed a motion to dismiss, which Alpine joined. The Association also filed a motion for rule 11 sanctions. *See* Utah R. Civ. P. 11(c). In the rule 11 motion, the Association argued that the Trustees "and their attorney should be sanctioned under Rule 11" because the Trust had asserted "punitive damages in an amount nearly one hundred (100) times the asserted actual damages."

*The Settlement Agreement*

¶7     The district court scheduled oral argument on the motion to dismiss and the motion for sanctions. On the morning of the scheduled argument, counsel for the Trust (Trust Counsel) and counsel for the Association (Association Counsel) exchanged emails. In those emails, Association Counsel made a settlement offer. Under this proposed settlement, the Association and Alpine would each make a payment to the Trust—without admitting liability—to help cover repair costs. In return, the Trust would dismiss the "entirety" of its claims against the Association and Alpine. Under the proposed settlement, the Trustees would also agree to never seek "election to, or otherwise serve[] on, the Management Committee for so long as they own any Unit" in the condominium project (the Management Provision).

¶8     Association Counsel confirmed that Alpine was "making the same offer on the same terms." Trust Counsel then sent an email "confirm[ing] the settlement." In that email, Trust Counsel also included additional terms about additional repairs that the Trustees wanted. Five minutes later, Trust Counsel sent another email, simply stating: "Modified to allow for payment in 30 days from today."

¶9     At the hearing later that day, Association Counsel informed the court that the parties had "settled this matter about 30 minutes" earlier. The court asked whether it should "put anything at all on the record" or whether the parties were "just

going to do it all in writing." Association Counsel and counsel for Alpine both said that the parties would "do it in writing." About one week later, Association Counsel sent a draft settlement agreement (Draft Agreement) to Trust Counsel.

¶10    A few days later, Trust Counsel filed a motion to withdraw as counsel for the Trust. Trust Counsel never responded to Association Counsel, and neither party signed any version of the Draft Agreement.

### The Association's Motion to Enforce

¶11    The Association objected to Trust Counsel's motion to withdraw and filed a contemporaneous motion to enforce the settlement agreement. The Association attached to this motion both the Draft Agreement and the email exchange between Trust Counsel and Association Counsel.

¶12    The following week, Fritsche hand-delivered a letter to the court. There, Fritsche said that the Trustees "did not agree to" the Draft Agreement. She wrote that the Trust had "no counsel" and that it was "searching for new counsel." The letter concluded by informing the court that the Trust needed "additional time to obtain counsel" to oppose the motion to enforce. A short time later, Trust Counsel filed a one-paragraph objection to the motion to enforce.

¶13    A few months after that, the Trust filed an amended opposition to the motion to enforce through new counsel (New Counsel). In the amended opposition, the Trust argued that there was no settlement agreement between the parties because "there was no meeting of the minds." The Trust claimed that the email exchange between Trust Counsel and Association Counsel showed that the parties "each proposed multiple different terms and those terms continued to change over time." The Trust further argued that because the parties agreed that their agreement would be reduced to writing, and because no written

agreement was ever signed, the emails could not be considered a settlement agreement.

¶14 In the alternative, the Trust argued that, even if there was "a meeting of the minds," the agreement was "unenforceable under the statute of frauds." According to the Trust, the Management Provision required the Trust to "surrender an interest in or power over or concerning real property." *See* Utah Code Ann. § 25-5-1 (LexisNexis 2019). For this reason, the Trust argued that the statute of frauds required Trust Counsel to obtain written authorization from the Trust to enter into that settlement agreement. The Trust then claimed that Trust Counsel lacked written authorization to enter into the settlement agreement and that it was accordingly unenforceable. But, notably, the Trust didn't support this lack-of-authorization claim with any affidavits or evidence.

¶15 The court later heard argument about whether a settlement agreement existed and, if so, whether the agreement was enforceable under the statute of frauds. Association Counsel began by arguing that the emails exchanged between him and Trust Counsel, as well as their subsequent representations to the court, collectively showed that there was a "definitive settlement." Association Counsel also argued that the Management Provision did not implicate an "interest in real property" and therefore was not subject to the statute of frauds.

¶16 For his part, New Counsel reiterated the Trust's arguments that (i) there was no meeting of the minds, and (ii) the agreement was unenforceable under the statute of frauds because Trust Counsel did not have written authorization from the Trust to surrender the right to participate on the management committee. New Counsel also argued that Trust Counsel did not act "in good faith" and "was actually self-dealing" because settling the matter would have allowed Trust Counsel to avoid a ruling on the rule 11 motion.

¶17 When arguments concluded, the district court ruled "that the emails between the parties in this case do constitute a binding settlement agreement between the parties." The court further held that it was "of no legal consequence" that the parties failed to sign the Draft Agreement because "[i]f a written agreement is intended to memorialize an oral agreement, a subsequent failure to execute a written document does not nullify the oral contract." The court also ruled that "if there [was] a statute of frauds defense," the Trust "waived [it] through counsel's emails, through the parties' actions, and through oral representation at the court hearing."

¶18 In sum, the court held that the parties had reached an enforceable settlement agreement and that the terms of that agreement were the terms included in the email exchange between Trust Counsel and Association Counsel—including the Management Provision.

*The Trust's Rule 60(b) Motion*

¶19 The Trust later filed a rule 60(b) motion asking for relief from the court's order granting the motion to enforce. *See* Utah R. Civ. P. 60 (allowing a court to grant parties "[r]elief from judgment or order"). There, the Trust asked the court to "reform the Settlement Agreement to provide relief from" the "Management Provision pursuant to Rule 60(b)(6) of the Utah Rules of Civil Procedure." *See id.* R. 60(b)(6) (allowing a court to "relieve a party" from an order based on "any other reason that justifies relief"). [1]

¶20 In its motion, the Trust claimed that the Trustees had "expressly informed" Trust Counsel that the Trust "would not

---

1. The Trust also challenged the enforceability of an offset provision. But because the Trust has not raised any issue relating to that offset provision on appeal, we do not address it further.

agree" to the Management Provision. The Trust also informed the court that it had been "reluctant" to bring "this issue" to the court earlier because it did not want to waive its attorney-client privilege, but it said that it was now ready to "present its full case to the Court or, in other words, shed new light on the circumstances of the purported Settlement Agreement."

¶21 This time, the Trust supported its position with evidence—notably, a declaration from Fritsche and some emails. In the declaration, Fritsche averred that she, "as trustee, [had] objected to" the Management Provision "on behalf of the Trust." She also claimed that she was "unaware" that Trust Counsel had planned on agreeing to the settlement offer in court. Fritsche asserted that "the Settlement Offer was purportedly accepted against [her] express instructions and over the Trust's express insistence that the . . . Management Provision of the Settlement Offer be reduced to a more formal writing."

¶22 The Trust also attached a string of emails between Trust Counsel and Fritsche, most of which had been exchanged within an hour of the Association's settlement offer. There, in response to Trust Counsel's communication of the offer to her, Fritsche had said: "First response—leave it." Trust Counsel had responded that he thought the Trust "should accept this deal," but that he was "happy to reject it and continue to litigate."

¶23 The Trust also attached a subsequent email from Fritsche to Trust Counsel. In reference to a settlement agreement prepared by Trust Counsel, Fritsche wrote, "Nice document but we will not sign it." She also explained to Trust Counsel that she thought the Management Provision was "unenforceable," and she instructed Trust Counsel to take the Management Provision out because it was "not part of [the] lawsuit."

¶24 In response to the rule 60(b) motion, the Association argued that the Trust "should have raised these arguments earlier." (Quotation simplified.) The Association further argued

that the Trust "knowingly and deliberately withheld" information from the court by waiting until the rule 60(b) motion to put forth Fritsche's declaration and the emails between Fritsche and Trust Counsel.

*The Association's Motion for Attorney Fees*

¶25   In addition to opposing the rule 60(b) motion, the Association moved for attorney fees. It asked the court to award the fees that the Association had already incurred, and would from that point further incur, while enforcing the settlement agreement, litigating the Trust's rule 60(b) motion, and litigating its own motion for attorney fees.

¶26   The Association argued that it was entitled to such fees because the Draft Agreement had a "prevailing party" attorney fee provision. Because the Trust had only objected to the Management Provision, the Association claimed that the attorney fee provision from the Draft Agreement should be considered as part of the parties' settlement agreement.

¶27   Alternatively, the Association argued that an attorney fee provision in Deer Valley Ridge's Condominium Declaration (the Declaration) applied.[2] The relevant provision states that "any failure to comply with any of the provisions" of the "Act, this Declaration, the Bylaws, and the rules and regulations of the Management Committee, all agreements and determinations lawfully made and/or entered into by the Management Committee or the Unit Owners" are "grounds for an action by the Management Committee or other aggrieved party for injunctive relief or to recover any loss or damage resulting therefrom, including costs and reasonable attorney's fees." The Association further claimed that, to "the extent that the

---

2. The Declaration details the covenants, conditions, and restrictions associated with the units.

settlement emails addressed attorneys' fees, the parties agreed to bear their own fees up to the date of settlement." The Association thus argued that the Declaration allowed it to collect attorney fees based on costs incurred after the "date of settlement."

¶28 In its reply, the Trust claimed that the court had previously held that the settlement agreement contained only the terms agreed to in the email exchange. But in that email exchange, the parties agreed that "each party [would] pay[] its own counsel fees." The Trust accordingly argued that the attorney fee provision in the Draft Agreement was not "part of the binding settlement agreement." In addition, the Trust asserted that the Declaration's attorney fee provision did "not govern" because the emails were a "subsequent" agreement that superseded the Declaration.

*The Court's Order*

¶29 The court later held a hearing on the Trust's rule 60(b) motion and the Association's motion for attorney fees. There, the parties reiterated the arguments they had made in their motions. And the Association made a new argument, not previously raised in its earlier motion, that it was entitled to attorney fees because the Trust's rule 60(b) motion was "not brought or asserted in good faith."

¶30 After arguments, the court denied the Trust's rule 60(b) motion. It ruled that the Trust's claim that Trust Counsel did not have written authorization to enter into the agreement had already been denied by the court and that the Trust "had not provided the court with a legally cognizable reason to reconsider its prior determination."

¶31 The court next denied the Association's motion for attorney fees, doing so for three reasons. First, it held that the terms "of the settlement agreement[] reached between the

parties via email . . . did not include a prevailing party attorneys' fee provision." Second, it held that the settlement agreement reached by email was "separate and apart from" the Declaration and that the Declaration should not "be imported" into the parties' settlement agreement. Third, it concluded that the rule 60(b) motion was made in "good faith," even if it was "fatally flawed."

¶32   The Trust timely appealed the court's orders that enforced the settlement agreement and denied the rule 60(b) motion. The Association, in turn, timely appealed the court's order denying its request for attorney fees.

ISSUES AND STANDARDS OF REVIEW

¶33   The Trust first challenges the district court's decision to enforce the Management Provision from the settlement agreement, claiming that it "is unenforceable under the statute of frauds." The "applicability of the statute of frauds is a question of law to be reviewed for correctness." *Thompson v. Capener*, 2019 UT App 119, ¶ 7, 446 P.3d 603 (quotation simplified).

¶34   The Trust next challenges the district court's denial of its motion for relief under rule 60(b)(6) of the Utah Rules of Civil Procedure. "This court reviews a district court's denial of a rule 60(b) motion for an abuse of discretion because most such motions are equitable in nature, saturated with facts, and call upon judges to apply fundamental principles of fairness that do not easily lend themselves to appellate review." *Norton v. Hess*, 2016 UT App 108, ¶ 8, 374 P.3d 49 (quotation simplified).

¶35   Finally, the Association challenges the district court's denial of its request for attorney fees. "The award of attorney fees is a matter of law, which we review for correctness." *Jensen v. Sawyers*, 2005 UT 81, ¶ 127, 130 P.3d 325. As part of this challenge, the Association also assails the district court's finding

that the Trust did not bring its rule 60(b) motion in bad faith. A "lower court's findings" on whether a claim was brought in bad faith "will be afforded a substantial measure of discretion." *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 2020 UT 47, ¶ 77, 469 P.3d 1003.

## ANALYSIS

### I. The Management Provision Is Enforceable.

¶36   As discussed above, the district court granted the Association's motion to enforce the settlement agreement—including, critically, the Management Provision. The Trust later filed a rule 60(b) motion that asked the court to reform the agreement and relieve it from enforcement of the Management Provision, but the court declined to do so. For the reasons set forth below, we affirm both rulings.

A.   During litigation on the motion to enforce, the Trust did not carry its burden of proving that Trust Counsel lacked written authority.

¶37   Under Utah's statute of frauds,

> [n]o estate or interest in real property, other than leases for a term not exceeding one year, nor any trust or power over or concerning real property or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared otherwise than by act or operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing.

Utah Code Ann. § 25-5-1 (LexisNexis 2019).

¶38    In the Trust's view, the statute of frauds applies to the Management Provision because it "surrendered the Trust's interest in a property right—the right to have its trustees seek election to the management committee." The Trust then argues that the Management Provision is unenforceable because Trust Counsel lacked "written authorization" to agree to it.

¶39    We need not resolve the question of whether the statute of frauds actually applies to the Management Provision. This is so because, even if we assume that the statute of frauds does apply, the Trust did not carry its burden of proving that Trust Counsel was not "authorized by writing" to agree to that provision. *See id.*

¶40    A successful statute of frauds defense will "bar enforcement of certain agreements that the law requires to be memorialized in writing." *Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 22, 241 P.3d 375 (quotation simplified). Importantly, the statute of frauds is an affirmative defense. *See* Utah R. Civ. P. 8(c) (listing affirmative defenses, including the "statute of frauds"). When a party raises an affirmative defense, it bears the burden of proof for that defense. *See, e.g., Salt Lake City Corp. v. Jordan River Restoration Network*, 2018 UT 62, ¶ 60, 435 P.3d 179 ("[A] respondent in a civil case generally bears the burden of proof when asserting affirmative defenses."); *Seale v. Gowans*, 923 P.2d 1361, 1363 (Utah 1996) (explaining that civil defendants bear the burden "of proving every element" of "any affirmative defense").

¶41    "'Burden of proof' is a catchall term that encompasses both the burden of persuasion and the burden of production and generally refers to a party's duty to prove a disputed assertion or charge." *Jordan River Restoration Network*, 2018 UT 62, ¶ 57 n.6; *see also Burden of Proof*, Black's Law Dictionary (11th ed. 2019) ("The burden of proof includes both the *burden of persuasion* and the *burden of production*." (Emphases in original.)). The burden of

persuasion is a "'party's duty to convince the fact-finder to view the facts in a way that favors that party.'" *Searle v. Milburn Irrigation Co.*, 2006 UT 16, ¶ 49 n.2, 133 P.3d 382 (quoting *Burden of Persuasion*, Black's Law Dictionary (7th ed. 1999)). And the burden of production is a "'party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling.'" *Id.* (quoting *Burden of Production*, Black's Law Dictionary (7th ed. 1999)).

¶42   In light of this, we have previously recognized that a party who raises a statute of frauds defense bears the burden of proof on that defense. *See Ashby v. Ashby*, 2008 UT App 254, ¶ 11, 191 P.3d 35, *aff'd in part, rev'd in part by Ashby v. Ashby*, 2010 UT 7, 227 P.3d 246; *see also Ashby*, 2010 UT 7, ¶ 7 n.4 (noting that our analysis on this "was correct"). So when the Trust asserted before the district court that the Management Provision was unenforceable under the statute of frauds, the Trust carried the burden of proof to support that defense. This meant that the Trust had the burden of persuasion—it needed to "convince the [district court] to view the facts in a way that favor[ed]" the Trust. *See Searle*, 2006 UT 16, ¶ 49 n.2. And the Trust also had the burden of production—it needed to "introduce enough evidence on [the statute of frauds issue] to have the issue decided by the" district court. *Id.* To carry these burdens, the Trust therefore needed to "introduce enough evidence" to "convince the [district court]" that Trust Counsel did not have written authorization to accept the Management Provision. *See id.*; Utah Code Ann. § 25-5-1.[3]

---

3. Indeed, given the nature of the claim at issue here, it makes particular sense that the Trust bore this burden. As noted, the crux of the Trust's claim is that its prior counsel was not authorized in writing to agree that the Trust could no longer

(continued…)

¶43     In the Trust's opposition to the motion to enforce—which is where the Trust first raised the statute of frauds defense—the Trust alleged that Trust Counsel "was never given written authority to enter into" the Management Provision. But the Trust did not include any evidence demonstrating that Trust Counsel acted without the Trust's written authority. Nor did the Trust claim to have any evidence that Trust Counsel lacked written authority. And the Trust's argument about this at the hearing on the motion to enforce was likewise unsupported. Indeed, at oral argument on appeal, the Trust acknowledged that the evidence allegedly showing that Trust Counsel lacked written authority "did not come in until . . . the [rule] 60(b) motion." All that the Trust put in front of the court prior to the rule 60(b) motion was its own conclusory and unsupported statement that Trust Counsel did not have the necessary authorization. But conclusory statements are not enough to satisfy a party's burden of proof. *See Rose v. Office of Pro. Conduct*, 2017 UT 50, ¶ 87 n.15, 424 P.3d 134 ("It goes without saying that one cannot meet one's burden of proof by making unsubstantiated allegations.").

¶44     Because the Trust offered only its own unsupported statement, and because it did not support this statement with any evidence that Trust Counsel lacked written authority, the Trust did not carry its burden of proof when opposing the Association's motion to enforce the settlement agreement. The district court therefore did not err in rejecting the Trust's statute

---

(…continued)

have a seat on the management committee. This question is not only factual, but it also necessarily implicates the precise terms of the attorney-client relationship at issue. While the Trust would have access to evidence of what authority it had (or had not) given Trust Counsel, the Association would not have had any such access. Thus, production of this evidence was uniquely within the Trust's control.

of frauds defense and in granting the Association's motion to enforce the Management Provision.[4]

B.      The district court did not abuse its discretion when it denied the Trust's rule 60(b) motion.

¶45      Again, after the district court entered its order declaring the settlement agreement to be enforceable, the Trust filed a rule 60(b) motion asking the court for "relief" from that order. In support of that motion, the Trust produced, for the first time, evidence of Trust Counsel's lack of authority to agree to the Management Provision. The Trust explained that it had not introduced this evidence earlier because it was reluctant to waive the attorney-client privilege. The court denied the rule 60(b) motion, however, concluding that the Trust had not provided a "legally cognizable reason" for it to reconsider its earlier decision. We affirm that decision.

¶46      "Rule 60(b) is an equitable rule designed to balance the competing interests of finality and fairness." *Menzies v. Galetka*, 2006 UT 81, ¶ 63, 150 P.3d 480. Under that rule, courts "may relieve a party or its legal representative from a judgment, order, or proceeding" based on an enumerated list of reasons. Utah R. Civ. P. 60(b). Here, the Trust based its motion on rule 60(b)(6)— the rule's residuary clause. A party asking for relief under rule 60(b)(6) must show, among other things, that there is "any other reason that justifies relief." *Id.*; *see also Laub v. South Central Utah Tel. Ass'n*, 657 P.2d 1304, 1306–07 (Utah 1982) (explaining the requirements of rule 60(b)'s residuary clause).

¶47      "The power given to" courts by rule 60(b)(6) should be "cautiously and sparingly invoked," and it should be used "only

---

4. Given our disposition of this issue, we need not address the Association's alternative contention that the Trust waived its statute of frauds defense.

in unusual and exceptional instances." *Laub*, 657 P.2d at 1307–08 (quotation simplified). The "most common other reason" for which Utah "courts have granted relief under rule 60(b)(6) is when the losing party fails to receive notice of the entry of judgment in time to file an appeal." *Kell v. State*, 2012 UT 25, ¶ 18, 285 P.3d 1133 (quotation simplified).

¶48    On appeal, we "grant broad discretion" to a trial court's rule 60(b) rulings. *Fisher v. Bybee*, 2004 UT 92, ¶ 7, 104 P.3d 1198; *see also Kell*, 2012 UT 25, ¶ 7. This deference is warranted because "most" rule 60(b) rulings "are equitable in nature, saturated with facts, and call upon judges to apply fundamental principles of fairness that do not easily lend themselves to appellate review." *Fisher*, 2004 UT 92, ¶ 7.

¶49    So far as we can tell, no Utah appellate decision has addressed a scenario quite like this one, where a party deliberately (and for its own reasons) chose to not present the district court with evidence that was within its control when the issue was initially litigated, only to later ask the court for relief under rule 60(b)(6) based on that evidence after it lost in the proceedings on the initial motion.

¶50    But other courts have suggested that rule 60(b)(6) should not be available in such circumstances. In *Ackermann v. United States*, 340 U.S. 193 (1950), for example, a court entered a denaturalization judgment against a citizen, and the citizen then chose to not appeal. *Id.* at 195. The citizen later filed for relief under rule 60(b)(6) of the Federal Rules of Civil Procedure, claiming that he did not appeal because a government official had advised him not to and because his attorney had told him that he would have to sell his house to pay for the appeal. *Id.* at 196. The Supreme Court held that relief was not justified under federal rule 60(b)(6) because the citizen "made a considered choice not to appeal." *Id.* at 198. Although the citizen's "choice was a risk," the Court held that there "must be an end to

litigation someday, and free, calculated, deliberate choices are not to be relieved from." *Id.*[5]

¶51    Other courts have held similarly. *See, e.g., Chang v. Smith*, 778 F.2d 83, 86 (1st Cir. 1985) ("Rule 60(b) cannot be used to relieve a litigant from improvident strategic choices."); *Budget Blinds, Inc. v. White*, 536 F.3d 244, 258 (3d Cir. 2008) (holding that the court abused its discretion in granting relief when the judgment "was the result of a deliberate choice" by the defendant); *Chambers v. Armontrout*, 16 F.3d 257, 261 (8th Cir. 1994) (holding that relief was not justified when the defendant "could have appealed" but chose not to); *Blinder, Robinson & Co. v. United States SEC*, 748 F.2d 1415, 1421 (10th Cir. 1984) (holding that relief was not justified when the party was represented by "competent and experienced lawyers who made a tactical decision which binds their clients"); *Aldana v. Del Monte Fresh Produce NA, Inc.*, 741 F.3d 1349, 1357 (11th Cir. 2014) (holding that "Rule 60(b)(6) does not reward a party that seeks to avoid the consequences of its own 'free, calculated, deliberate choices'" (quoting *Ackermann*, 340 U.S. at 198)); *see also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2864 (3d ed. 2021) ("Thus, the broad power granted by clause (6) is not for the purpose of relieving a party from free, calculated, and deliberate choices the party has made. A party remains under a duty to take legal steps to protect [its] own interests.").

¶52    In its rule 60(b)(6) motion, the Trust acknowledged that it had previously withheld evidence about its communications

---

5. "Because the Utah Rules of Civil Procedure are patterned after the Federal Rules of Civil Procedure, where there is little Utah law interpreting a specific rule, we may also look to the Federal Rules of Civil Procedure for guidance." *Drew v. Lee*, 2011 UT 15, ¶ 16, 250 P.3d 48 (quotation simplified).

with Trust Counsel because it was "reluctant" to waive the attorney-client privilege. Put differently, the Trust admitted that it had made a "deliberate choice[]" to initially oppose the enforcement of the settlement agreement without presenting that evidence. *Ackermann*, 340 U.S. at 198. While the Trust was certainly entitled to make that decision, the district court was not required to then grant the Trust a do-over under the guise of rule 60(b)(6) after the Trust lost in the initial proceedings.

¶53   This is particularly so because the nature of the Trust's statute of frauds defense would have required it to waive the attorney-client privilege all along. A party waives the attorney-client privilege "by placing attorney-client communications at the heart of a case." *Doe v. Maret*, 1999 UT 74, ¶ 9, 984 P.2d 980, *overruled on other grounds by Munson v. Chamberlain*, 2007 UT 91, ¶¶ 20–21, 173 P.3d 848. And attorney-client communications are "at the heart of [the] case" when a client claims that counsel did not have authority to enter into a settlement agreement. *See Terry v. Bacon*, 2011 UT App 432, ¶ 15, 269 P.3d 188 (holding that clients waived the attorney-client privilege by claiming "that they did not authorize former counsel to enter into the settlement agreement").

¶54   As discussed above, the Trust's statute of frauds defense was premised on its assertion that it had never authorized its prior counsel in writing to agree to the Management Provision. The Trust simply could not have prevailed on that defense without waiving the privilege as to that issue. Given this, the Trust's decision to initially sit on its own evidence, only to then try introducing it for the first time in support of its rule 60(b)(6) motion, was not the kind of tactic that the district court was required to countenance.

¶55   Again, the purpose of rule 60(b) is "to balance the competing interests of finality and fairness." *Menzies*, 2006 UT 81, ¶ 63. Here, the Trust invoked rule 60(b) after making a

"deliberate choice[]" not to present evidence "at the heart of [the] case" during the initial litigation about that issue. *See Ackermann*, 340 U.S. at 198; *Maret*, 1999 UT 74, ¶ 9. Given that choice, the district court did not abuse its "broad discretion" when it denied that motion. *See Fisher*, 2004 UT 92, ¶ 7.

## II. The Association Is Not Entitled to Attorney Fees.

¶56     In its cross-appeal, the Association claims that the district court "erred in denying the Association's request for attorneys' fees." The Association makes three arguments to support this claim. We reject all three.

¶57     First, the Association argues that the Trust "never objected" to the attorney fee provision in the Draft Agreement. But the Draft Agreement was not the "binding settlement agreement." Rather, the "binding settlement agreement" was the agreement that the parties reached in the email exchange between Trust Counsel and Association Counsel. In that exchange, the parties agreed that each party would "pay its own counsel fees." The court therefore correctly concluded that the Association was not entitled to attorney fees under the settlement agreement. *See Turtle Mgmt., Inc. v. Haggis Mgmt., Inc.*, 645 P.2d 667, 671 (Utah 1982) ("[T]he award of attorney's fees is allowed only in accordance with the terms of the contract.").

¶58     Second, the Association argues that it is "entitled to fees under the Declaration" because the Trust failed to comply with the settlement agreement.[6] Under the Declaration,

---

6. The Trust asserts that this argument is unpreserved because, before the district court, the Association only argued that it was entitled to attorney fees because the "Declaration was the basis for the underlying suit." Because we resolve this issue in favor of the Trust, we need not address its preservation argument. *See*

(continued…)

> [e]ach Unit Owner, tenant, subtenant or other occupant of a Unit shall comply with the provisions of the Act, this Declaration, the Bylaws, and the rules and regulations of the Management Committee, all agreements and determinations lawfully made and/or entered into by the Management Committee or the Unit Owners, when acting in accordance with their authority, and any *failure to comply* with any of the provisions thereof shall be grounds *for an action by the Management Committee* or other aggrieved party for injunctive relief or to recover any loss or damage resulting therefrom, including costs and reasonable attorney's fees.

(Emphases added.)

¶59 This Court "interpret[s] the provisions of [a] Declaration as we would a contract. If the Declaration is not ambiguous, we interpret it according to its plain language." *View Condo. Owners Ass'n v. MSICO, LLC*, 2005 UT 91, ¶ 21, 127 P.3d 697 (quotation simplified). Because the relevant language from the Declaration is not ambiguous, we interpret it according to its plain language.

¶60 As indicated by the emphasized language above, the plain terms of the Declaration only entitle the Association to attorney fees if the Management Committee brings "an action" against a unit owner for a "failure to comply" with the terms of an agreement made by the Management Committee.

---

(…continued)
*State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation." (Emphasis in original.)).

¶61 But here, although the Association moved to enforce the settlement agreement, the Management Committee never brought "an action" against the Trust based on the Trust having "fail[ed] to comply" with any particular term of that agreement. The Declaration itself therefore does not entitle the Association to attorney fees.

¶62 Third, the Association argues that it "is entitled to attorney fees under Utah Code § 78B-5-825." Under this statute, a "court shall award reasonable attorney fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith." Utah Code Ann. § 78B-5-825(1) (LexisNexis 2018).

¶63 "To find that a party acted in bad faith," a court must conclude that "at least one of" three factors existed: "(i) [t]he party lacked an honest belief in the propriety of the activities in question; (ii) the party intended to take unconscionable advantage of others; or (iii) the party intended to or acted with the knowledge that the activities in question would hinder, delay, or defraud others." *Migliore v. Livingston Fin., LLC*, 2015 UT 9, ¶ 32, 347 P.3d 394 (quotation simplified). As explained above, we "afford[] a substantial measure of discretion" to a "lower court's findings" on whether a claim was brought in bad faith. *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 2020 UT 47, ¶ 77, 469 P.3d 1003.

¶64 Below, the court stated that it "simply ha[d] not been provided with a factual basis to make any of those three specific findings." This ruling was unsurprising given that the Association had not made its bad faith argument in its motion for attorney fees but had instead raised it for the first time at the hearing on the motion. And even there, the Association merely asserted that the rule 60(b) motion was brought in bad faith because the evidence presented in that motion "was already known" by the Trust.

¶65 Given the sparse arguments made by the Association at the hearing and the "substantial measure of discretion" we must afford to the district court, we conclude that the district court did not abuse its discretion in ruling that the Association was not entitled to attorney fees under section 78B-5-825(1).[7]

CONCLUSION

¶66 When the Trust opposed the Association's motion to enforce the settlement agreement by claiming that the Management Provision violated the statute of frauds, it raised an affirmative defense for which it bore the burden of proof. It then failed to carry that burden because it presented no evidence that Trust Counsel lacked written authority to enter into the settlement agreement. The district court therefore did not err by rejecting that defense and granting the Association's motion to enforce. Although the Trust later attempted to cure this failure in its rule 60(b) motion, the Trust has not shown that the court abused its discretion when it denied that request.

¶67 The district court also did not err in concluding that the Association was not entitled to attorney fees under the

---

7. Before the district court, the Association only argued that Trust Counsel brought the rule 60(b) motion in bad faith. On appeal, however, the Association claims that the Trust also acted in bad faith at various other stages of the litigation. But "[w]hether a claim or defense was not brought or asserted in good faith is a fact-intensive mixed question," and it ultimately "requires a factual determination of a party's subjective intent." *Pinder v. Duchesne County Sheriff*, 2020 UT 68, ¶ 102, 478 P.3d 610 (quotation simplified). Given that the Association did not provide the district court with the opportunity to consider whether these additional acts were performed in bad faith, we are in no position on appeal to consider whether this was so.

settlement agreement or the Declaration, nor did the court abuse its discretion in concluding that the Trust did not act in bad faith when it brought its rule 60(b) motion.

¶68    For the foregoing reasons, we affirm.

——————